ARNOLDO CASILLAS, ESQ., SBN 158519
DANIEL W. GILLETTE, ESQ., SBN 244019
CASILLAS & ASSOCIATES
3777 Long Beach Blvd., Third Floor
Long Beach, CA 90807
Tel:  (562) 203-3030
Fax: (323) 297-2833
Email: acasillas@casillaslegal.com

Attorneys for Plaintiff RODRIGO DECASAS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODRIGO DECASAS, an incompetent adult, by and through his guardian ad litem, Veronica Banuelos,<br><br>Plaintiff,<br><br>vs.<br><br>MARK RIDLEY-THOMAS; HILDA SOLIS; SHEILA KUEHL, LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER; COUNTY OF LOS ANGELES; RONALD BROWN; KELLY EMLING; LAURA GREEN, MICHAEL SUZUKI; JENNY BROWN; DANIEL KUPERBERG; RUBEN MARQUEZ; AND DOE DEFENDANTS 1 THROUGH 10, INCLUSIVE,<br><br>Defendants. | **CASE NO.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**CIVIL RIGHTS VIOLATIONS PURSUANT TO 42 U.S.C. § 1983**<br><br>**1.  DELIBERATE INDIFFERENCE TO CONSTITUIONAL VIOLATIONS**<br><br>**2. MUNICIPAL LIABILITY FOR CONSTITUIONAL VIOLATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

COMES NOW plaintiff RODRIGO DECASAS, and alleges as follows:

# I.

## INTRODUCTION

1.      In 2005, Michael Judge, then the Public Defender for Los Angeles County, served as the Chair of a ten-member Working Group that was appointed by the State Bar Board of Governors in May 2004 and that was tasked with the revision of The State Bar of California Guidelines for the delivery of indigent defense services.  In 2006, Michael Judge's work resulted in revisions to the State Bar's guidelines for the provision of indigent legal defense services.  Also, in 2006, Rodrigo DeCasas became a client of the Los Angeles County Public Defender's Office.  Regretfully, the administrators of the Los Angeles County Public Defender's Office ignored these important guidelines that were intended to ensure that their clients' constitutional rights were protected.  As a result of this failure, Rodrigo DeCasas has now spent more than 14 years in civil detention because the Public Defender's Office did not get his case to trial.  Because of this great delay, the Superior Court had no choice but to conclude that Mr. DeCasas's constitutional rights to a speedy trial had been violated and the court dismissed his case.  Thereafter, the Court of Appeal of the State of California affirmed the decision in a published opinion which critically declares that the delay resulted from a systemic breakdown in the public defender system.

2.      The State Bar of California Guidelines for Indigent Defense Services Delivery System warn that excessive attorney workloads can compromise the ability of the public defender attorneys to render competent and quality representation in a timely manner.  The guidelines warn that number and type of cases for which an attorney is responsible may impact the quality of representation individual clients receive.   For that reason, the guidelines state that no attorney should be assigned more cases than he or she can effectively handle. The guidelines require that appropriate records should be kept by the administrators of the public defender offices to avoid assigning an excessive number of cases to an attorney.  Further, the

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  guidelines state that the public defender administrators bear the ultimate

2  responsibility for assuring that workloads are not excessive in volume for any

3  attorney to whom cases are assigned.   According to the guidelines, failure of a public

4  defender administrator to effectively address the effects of workloads can result in

5  personal civil liability and could put his or her license to practice law in jeopardy.

6      3.    The guidelines that Michael Judge and his working group developed

7  state that should a public defender administrator determine that the current and

8  incoming workload exceeds the capacity of the organization to provide necessary and

9  competent representation, it is incumbent upon these administrators to secure the

10  additional resources necessary or to decline to accept new cases to the extent that they

11  exceed the capacity of the defense delivery system.

12      4.    Sadly, the guidelines that Michael Judge and the State Bar working

13  group developed and implemented were ignored by the present defendants all to the

14  great detriment of the present Plaintiff, Rodrigo DeCasas and his constitutional rights.

15  Mr. DeCasas's case are replete with examples of the attorneys from the Los Angeles

16  County Public Defenders' Office then beseeching their supervisors, the

17  administrators of this office and the Los Angeles County Board of Supervisors, for

18  help to ameliorate the great negative impact of the overwhelming workload.  These

19  same attorneys warned the administrators and the Board of Supervisors repeatedly of

20  the violations of the civil rights of the persons being represented by the PD's Office,

21  including Mr. Rodrigo DeCasas, and of the impending related civil liability related to

22  the civil rights violations.   The letters and memoranda starkly stated that the

23  workload was so great that they were no longer "competent" to represent Mr.

24  DeCasas.   The attorneys handling Mr. DeCasas's case simply could not get his case

25  to trial because of the customs and practices that were in place at the PD's Office and

26  because of the failures of their supervisors and administrators in addressing their case

27  load.  Despite this, the present administrator defendants and those defendants from

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

the Los Angeles County Board of Supervisors refused to take even modest measures to protect Mr. DeCasas's constitutional rights to due process and a speedy trial. They consciously allowed him to remain in civil detention for 13 years.

## II.

## SUMMARY OF CASE

5.      Plaintiff Rodrigo DeCasas (hereafter also "Mr. DeCasas") has been held in custody in a psychiatric hospital for more than 13 years awaiting trial.   The extraordinary length of this delay resulted from a systemic breakdown in the Los Angeles County public defender system.  This breakdown forced Mr. DeCasas to choose between having prepared counsel and a timely trial. Under the Constitution he had a right to both.  He got neither.

6.      After the office of the Office of the Public Defender was removed as his attorney, the Los Angeles County Superior Court dismissed the civil detention action against him finding that the 13-year pre-trial detention was so presumptively prejudicial and oppressive that Mr. DeCasas's due process rights were violated.  The Court of Appeal of the State of California has affirmed this conclusion in a published opinion.

7.      The constitutional violations suffered by Mr. DeCasas in being denied a speedy trial and due process resulted from the deliberate indifference to his constitutional rights by the present defendants who all aware of his long unconstitutional detention and acquiesced in the violation of Mr. DeCasas's civil rights.

8.      The purpose of the present action is to bring to light the complete failure of the Public Defender's office and The County of Los Angeles to carry out their statutory and ethical duties to their clients, and the failure of the individually named defendants to ensure that Mr. DeCasas was receiving constitutionally adequate service.

4

9.     Further, in keeping with one of the goals of 42 U.S.C. Section 1983, the purpose of the of this action is also to make examples of the individual defendants so as to ensure that other similarly-situated public officials honor their promise to protect and defend the constitution of the United States.

## III.

## JURISDICTION AND VENUE

10.    This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourteenth Amendment of the United States Constitution.  Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

11.    Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

## IV.

## PARTIES

### Plaintiff

12.     At all times relevant hereto, Plaintiff Rodrigo DeCasas (hereafter also "Mr. DeCasas" and "Plaintiff") is and was a resident of the County of Los Angeles, California.

### Administrators and Managers of the Law Offices of the
### Los Angeles County Public Defender

13.    Defendant Ronald Brown:

a.    At all times relevant hereto defendant Ronald Brown was a resident of the County of Los Angeles.  Ronald Brown was appointed public defender of the County of Los Angeles in 2011 and served as the public defender for Los Angeles County until 2016.  Prior to that, he served as Assistant Public Defender from 2006 to 2011. During that time, he also

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

held supervisorial and administrative positions.  As the Public Defender, he was vested by law with the responsibility of representing indigent defendants in Los Angeles County at all stages of the criminal proceedings and in all stages of civil detention proceedings related to indigent persons detained pursuant to California *Welfare and Institutions Code*, section 6600, et seq.

b.   As early as 2006, when defendant Ronald Brown began serving as Assistant Public Defender, he was informed of the present plaintiff's pending SVP proceedings and he monitored Mr. DeCasas's case until defendant Brown retired in 2016.  The present defendant did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. DeCasas. Liability against this defendant is based on this defendant's role as administrator of the Law Offices of the Los Angeles County Public Defender (hereafter also "PD's Office") and its SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.   With respect to all conduct alleged herein, defendant Ronald Brown acted under the color of law and in the course and scope of his employment with the County of Los Angeles.  During all said time, he was also a high-ranking administrator and policy maker for the for the PD's Office.

d.   At all times relevant hereto and as the Public Defender for Los Angeles County, and before that as Assistant Public Defender, defendant Ronald Brown was an administrator and supervisor with the authority to:

6

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

     i.  develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender;

     ii.  develop and implement specific training programs for public defender personnel, including deputy public defenders,

     iii.  secure budget allocations for the funding for specific units, personnel needs and cases within his office;

     iv.  declare in any case being handled by his office that the public defender's office is "unavailable" and thereby have a court assign the case to another public defender agency (Los Angeles County Alternate Public Defender) or to a private panel attorney for handling;

     v.  declare conflicts of interest; and,

     vi.  order or otherwise undertake all necessary measures to ensure that any case handled by the public defender's office would be brought to trial in a timely manner.

e.  Defendant Ronald Brown monitored the civil detention proceedings of Mr. DeCasas between 2006 and 2016.  Defendant Brown had specific knowledge Mr. DeCasas's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to his prolonged unconstitutional detention and the resulting violation of Mr. DeCasas's civil rights.

f.  Defendant Brown is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the administration of the PD's Office and its SVP unit and in the training, supervision and/or control of his subordinates.  He is also sued in his personal capacity for his

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    acquiescence and ratification under color of law in the constitutional

2    deprivations which this complaint alleges and for the conduct that

3    showed a reckless or callous indifference to the rights of the present

4    plaintiff.  Defendant Brown's affirmative conduct, as described herein

5    below, also involves his acquiescence to, and ratification of, specific

6    customs, practices and policies and procedures carried out by his

7    subordinates which this defendant knew, or should have known, would

8    inflict a constitutional violation upon the present plaintiff.

9    14.   Defendant Kelly Emling:

10   a.    At all times relevant hereto defendant Kelly Emling was a resident of the

11   County of Los Angeles, and, as relevant here, served as an administrator

12   within The Law Offices of the Los Angeles County Public Defender.

13   She had the responsibility of supervising and administering the

14   representation of indigent defendants in all stages of civil detention

15   proceedings related to persons detained pursuant to California *Welfare*

16   *and Institutions Code*, section 6600, et seq., including SVP detainees

17   awaiting trial. With respect to all conduct alleged herein, defendant

18   Emling acted under the color of law and in the course and scope of her

19   employment with the County of Los Angeles as an administrator of the

20   SVP Unit.  As an administrator within the PD's office, defendant Emling

21   was also an administrator and supervisor with the authority to develop,

22   adopt, ratify, implement, modify, abolish, revoke and rescind all

23   customs, practices, procedures and policies of the Law Offices of the

24   Los Angeles County Public Defender;

25   b.    Defendant Emling did not appear as counsel for Plaintiff in the

26   underlying proceedings or otherwise represent Plaintiff.  As such,

27   liability against this defendant is not based on this defendant acting

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

within the scope of legal representation of Mr. DeCasas. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

c.   Defendant Emling is sued in her personal capacity as supervisor and administrator for her own culpable action or inaction with respect to the present plaintiff, and in the administration and supervision of the SVP Unit and in the training, supervision and/or control of her subordinates as well as for her indifference as well as for her indifference to the constitutional violations which resulted from her supervision of and administration of the SVP Unit.  She is also sued in her personal capacity for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by her that showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

15.   Defendant Michael Suzuki:

a.   At all times relevant hereto defendant Michael Suzuki was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention

9

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Suzuki acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.     As a Division Chief and/or as a supervisor in the PD's Office and its SUV unit, defendant Suzuki was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.     Liability against defendant Suzuki is based only on this defendant's role as administrator of the PD's office and the SVP unit, but also this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.     After his promotion to supervisor/administrator within the PD's Office, Mr. Suzuki monitored the SVP Unit's civil detention proceedings, including those of Mr. DeCasas.  As a result, defendant Suzuki had specific knowledge regarding the civil detention proceedings for Mr. DeCasas and, as spelled out herein below, was deliberately indifferent to the violation of Mr. DeCasas's civil rights which resulted from his long and unconstitutional detention.

e.     Defendant Suzuki is sued in his personal capacity as supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of his subordinates as well as for his indifference to the constitutional

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    violations which resulted from his supervision of and administration of

2    the SVP Unit.  He is also sued in his personal capacity for his

3    acquiescence in, and ratification of,the constitutional deprivations which

4    this complaint alleges and for the conduct carried out by him that

5    showed a reckless or callous indifference to this Plaintiff's rights.  This

6    defendant's affirmative conduct, as described herein below, involves his

7    acquiescence to, and ratification of, specific customs, practices and

8    policies and procedures carried out by his subordinates which this

9    defendant knew, or should have known, would inflict a constitutional

10   violation upon the present.

11   16.   Defendant Jenny Brown:

12   a.   At all times relevant hereto defendant Jenny Brown was a resident of the

13       County of Los Angeles, and, as relevant here, served as administrator

14       within The Law Offices of the Los Angeles County Public Defender.

15       She had the responsibility of administering and supervising the

16       representation of indigent defendants in all stages of civil detention

17       proceedings related to persons detained pursuant to California Welfare

18       and Institutions Code, section 6600, et seq., including SVP detainees

19       awaiting trial.  With respect to all conduct arising from her work as an

20       administrator and supervisor of the SVP Unit, defendant Jenny Brown

21       acted under the color of law and in the course and scope of her

22       employment with the County of Los Angeles.

23   b.   As a Division Chief and/or as a supervisor in the PD's SUV unit,

24       defendant Jenny Brown was also an administrator with the authority to

25       develop, adopt, ratify, implement, modify, abolish, revoke and rescind

26       all customs, practices, procedures and policies of the Law Offices of the

27       Los Angeles County Public Defender's SVP Unit.

28

11

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.     Defendant Jenny Brown did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. DeCasas. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

d.     After her promotion to supervisor/administrator, defendant Jenny Brown monitored the SVP Unit's civil detention proceedings, including those of Mr. DeCasas.  As a result, defendant Jenny Brown had specific knowledge regarding the civil detention proceedings of Mr. DeCasas and, as spelled out herein below, was deliberately indifferent to the violation of Mr. DeCasas's civil rights which resulted from his long and unconstitutional detention.

e.     Defendant Jenny Brown is sued in her personal capacity as a supervisor and administrator for her own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of her subordinates as well as for her indifference to the constitutional violations which resulted from her supervision of and administration of the SVP Unit.  She is also sued in her personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by her that showed a reckless or callous indifference to the violation of constitutional rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

17.   Defendant Daniel Kuperberg:

a.   At all times relevant hereto defendant Daniel Kuperberg was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Kuperberg acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.   As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Kuperberg was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.   Defendant Kuperberg did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. DeCasas. Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's ratification of, and acquiescence in, and ratification of, the

13

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   unconstitutional customs and practices which resulted in the present

2   plaintiff's harm and damages as alleged herein.

3   d.   After his promotion to supervisor/administrator, defendant Kuperberg

4   monitored the SVP Unit's civil detention proceedings, including those of

5   Rodrigo DeCasas.  As a result, defendant Kuperberg had specific

6   knowledge regarding the civil detention proceedings for plaintiff

7   Rodrigo DeCasas and, as spelled out herein below, was deliberately

8   indifferent to the violation of Mr. DeCasas's civil rights which resulted

9   from his long and unconstitutional detention.

10  e.   Defendant Kuperberg is sued in his personal capacity as supervisor and

11  administrator for his own culpable action or inaction with respect to the

12  present plaintiff, and in the training, supervision and/or control of his

13  subordinates as well as for his indifference to the constitutional

14  violations which resulted from his supervision of and administration of

15  the SVP Unit.  He is also sued in his personal capacity for his

16  acquiescence in, and ratification of,the constitutional deprivations which

17  this complaint alleges and for the conduct carried out by him that

18  showed a reckless or callous indifference to the rights of the present

19  plaintiff.  This defendant's affirmative conduct, as described herein

20  below, involves his acquiescence to, and ratification of, specific

21  customs, practices and policies and procedures carried out by his

22  subordinates which this defendant knew, or should have known, would

23  inflict a constitutional violation upon the present plaintiff.

24  ////

25  ////

26  ////

27  ////

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

18.  Defendant Ruben Marquez:

a.  At all times relevant hereto defendant Ruben Marquez was a resident of the County of Los Angeles, and, as relevant here, served as administrator within The Law Offices of the Los Angeles County Public Defender.  He had the responsibility of administering and supervising the representation of indigent defendants in all stages of civil detention proceedings related to persons detained pursuant to California Welfare and Institutions Code, section 6600, et seq., including SVP detainees awaiting trial.  With respect to all conduct arising from his work as an administrator and supervisor of the SVP Unit, defendant Marquez acted under the color of law and in the course and scope of his employment with the County of Los Angeles.

b.  As a Division Chief and/or as a supervisor in the PD's SUV unit, defendant Marquez was also an administrator with the authority to develop, adopt, ratify, implement, modify, abolish, revoke and rescind all customs, practices, procedures and policies of the Law Offices of the Los Angeles County Public Defender's SVP Unit.

c.  Defendant Marquez did not appear as counsel for Plaintiff in the underlying proceedings or otherwise represent Plaintiff.  As such, liability against this defendant is not based on this defendant acting within the scope of legal representation of Mr. DeCasas.  Liability against this defendant is based on this defendant's role as administrator of the PD's office and the SVP unit, as well as this defendant's acquiescence in, and ratification of, unconstitutional customs and practices which resulted in the present plaintiff's harm and damages as alleged herein.

15

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d.   After his promotion to supervisor/administrator, defendant Marquez monitored the SVP Unit's civil detention proceedings, including those of Rodrigo DeCasas.  As a result, defendant Marquez had specific knowledge regarding the civil detention proceedings for plaintiff Rodrigo DeCasas and, as spelled out herein below, was deliberately indifferent to the violation of Mr. DeCasas's civil rights which resulted from his long and unconstitutional detention.

e.   Defendant Marquez is sued in his personal capacity as a supervisor and administrator for his own culpable action or inaction with respect to the present plaintiff, and in the training, supervision and/or control of his subordinates as well as for his indifference to the constitutional violations which resulted from his supervision of and administration of the SVP Unit.  He is also sued in his personal capacity for his acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for the conduct carried out by him that showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves his acquiescence to, and ratification of, specific customs, practices and policies and procedures carried out by his subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

////

////

////

////

////

////

16

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

**Board of Supervisor Defendants**

19.     Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl (hereafter also "BOS Defendants") were members of the Los Angeles County Board of Supervisors from 2014 up to and beyond September 1, 2020.  As presented below, and per the Los Angeles County Charter and these defendants' personal custom and practice, each one of these defendants were responsible for the management, supervision and administration of the Law Offices of the Los Angeles Public Defender.  During their individual tenure, each of the BOS Defendants learned of Mr. DeCasas's SVP case, of his prolonged detention, and - through letters and memoranda from individual deputy public defenders at the SVP Unit - of the inability and failure of the PD's Office to timely bring Mr. DeCasas's case to trial.  Despite repeated entreaties and warnings from the attorney staff of the PD's office, the BOS Defendants failed to take any action to address the violation of Mr. DeCasas's rights to due process and a speedy trial.  The BOS Defendants each knew, as early as September of 2014, that Mr. DeCasas would be held indefinitely in civil detention without trial unless they took action on his behalf.  Despite having the authority to do so, they refused to address the ongoing violation of his constitutional rights. The letters and memoranda they each received from the deputy public defenders in the SVP unit informed these defendants that the attorneys were unable to process Mr. DeCasas's case and the attorneys also warned these defendants of the civil liability that would result should these defendants not act to correct the failures in the handling of Mr. DeCasas's case.  Despite this knowledge, each of the BOS Defendants refused to take any action to ensure that Mr. DeCasas's case was brought to trial in a timely fashion.  As a result, his constitutional rights to due process and a speedy trial were violated as spelled out herein.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

20.   Defendant Mark Ridley-Thomas

a.   At all times relevant hereto defendant Mark Ridley-Thomas was a resident of the County of Los Angeles.  He is and has been a member of the Board of Supervisors of Los Angeles County since 2008.  As part of his duties as a member of the Los Angeles County Board of Supervisors, he was assigned with the administrative responsibility of directly overseeing, managing, directing and/or controlling defendant Law Offices of the Los Angeles County Public Defender.  With respect to his oversight, management and supervision of the Law Offices of the Los Angeles County Public Defender, Mark Ridley-Thomas did not have to seek authorization from the Board of Supervisors for his decisions, none of such decisions were required to be put before the Board of Supervisors for approval in the form of resolutions, policy determinations or other legislative acts.   The acts and omissions of Mark Ridley-Thomas alleged herein were made on a case-by-case basis.

b.   With respect to all conduct alleged herein, defendant Ridley-Thomas acted under the color of law.

c.   Per his responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Mark Ridley-Thomas had the authority to:

i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

////

////

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

ii. develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

iii. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

iv. instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d. Defendant Mark Ridley-Thomas oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender. In carrying out his oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Mark Ridley-Thomas had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with the consent of Mark Ridley-Thomas.

e. These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. DeCasas's

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    case, the backlog of work in the unit, the understaffing of that unit, and

2    the extended time periods that SVP Unit clients were being detained.

3    f.    Defendant Mark Ridley-Thomas requested and received regular

4    memoranda, emails, reports, budget requests, and other written

5    correspondence and documents from defendants Ronald Brown, Kelly

6    Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg

7    and Ruben Marquez and other members of the Public Defender's Office

8    regarding the management and operation of the SVP Unit, including the

9    status of Mr. DeCasas's civil detention proceedings. Defendant Ridley-

10    Thomas had specific knowledge regarding Plaintiff's civil detention

11    proceedings and, as spelled out herein below, was deliberately

12    indifferent to the violation of Mr. DeCasas's civil rights.   Defendant

13    Mark Ridley-Thomas was aware of the present plaintiff's SVP case, the

14    long delay in getting his case to trial, and the unconstitutional customs

15    and practices which caused the delays in getting Plaintiff's case to trial.

16    g.    Defendant Mark Ridley-Thomas is sued in his personal capacity as a

17    supervisor and administrator for his own culpable action or inaction

18    related to the management of Mr. DeCasas's case, and for his specific

19    conduct and deliberate indifference which resulted in the violation of the

20    present Plaintiff's constitutional rights.  He is also sued in his personal

21    capacity for his acquiescence in, and ratification of, the constitutional

22    deprivations which this complaint alleges and for his conduct which

23    showed a reckless or callous indifference to the rights of the present

24    plaintiff.  This defendant's affirmative conduct, as described herein

25    below, involves his acquiescence to, and ratification of specific conduct

26    carried out by his subordinates which this defendant knew, or should

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    have known, would inflict a constitutional violation upon the present

2    plaintiff.

3    h.    With respect to the individual cases handled by the PD's office,

4          defendant Mark Ridley-Thomas often managed individual cases that

5          were being handled by the PD's Office.  In his role as a supervisor and

6          administrator of the Office of the Public Defender, he was allowed to,

7          and did, deal with individual cases that were assigned to the PD's office.

8          This defendant would either request that the client's file be brought to

9          his office or inquire directly with Ronald Brown, or other supervisors in

10         the PD's Office as to individual cases. He would instruct the Ronald

11         Brown and his subordinates as to the management of the case, push for a

12         particular outcome, and demand that the particular case be resolved in a

13         particular way.   It was not uncommon, in fact, for employees of the

14         Chief Executive Office to bring public defender files to the office of

15         Mark Ridley Thomas at his request.  This included delivery of files by

16         the County Executive Officer, William T. Fujioka, to this defendant's

17         office.

18   i.    From 2006 on, this defendant learned of Mr. DeCasas's case during the

19         various monthly meetings with Ronald Brown and the other

20         administrators and supervisors of the PD's office. In the discussion of

21         the operations of the SVP Unit, individual cases were presented to this

22         defendant. This defendant learned that Mr. DeCasas was being

23         medicated against his will on a daily basis.  This distinguished Mr.

24         DeCasas's case from the other SVP cases, as he was the only SVP client

25         that was subject to a forced medication court order and this put

26         defendant Ridley-Thomas on notice of Mr. DeCasas's individual case.

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

j.    In 2006, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in 2006 a large backlog of cases and that the superior court as well as the District Attorney's Office became concerned that the SVP cases were not being processed.  New legislation came into effect which required that unadjudicated pending SVP cases be brought to trial within 24 months. At that point, this defendant, Ronald Brown and the PD's managers and administrators agreed that it was best to declare themselves "unavailable" and to request that the court appoint private counsel for Mr. DeCasas and other SVP clients. Defendant Ridley-Thomas knew in 2006 that if private counsel was not appointed for Mr. DeCasas, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. DeCasas's case and new legislation required that those earlier cases be promptly tried.  This created a conflict of interest within the PD's Office; i.e., they were forced to decide which SVP client would get priority over other SVP clients and have their case brought to trial.   Recognizing this conflict of interest, this defendant, Ronald Brown and the PD's managers and administrators agreed that they would declare the PD's Office unavailable as to these cases and have the court appoint private counsel.

k.    In 2007, it became apparent to defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office that this plan would not be successful.  The court informed them that there was

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   not an adequate amount of willing and qualified private attorneys to

2   assume the management of the SVP cases.  As such, those cases which

3   were to be transferred out of the SVP unit to private counsel to relieve

4   the workload would remain in the SVP unit.  As such, this defendant

5   knew that the overworked attorneys and staff in the SVP unit would

6   continue to be overwhelmed with the high volume of cases and that the

7   long expected delays in the bringing of the cases to trial would persist,

8   including the delay in the processing of Mr. DeCasas's case.

9   l.   In 2007, through the implementation of a memorandum of understanding

10   between the PD's Office, the Superior Court and the Office of the

11   District attorney it was agreed that these cases would remain in the SVP

12   Unit. By the SVP cases remaining in the PD's office, it was expected by

13   PD's Office, the Superior Court and the District Attorney's Office that

14   Mr. DeCasas and the other SVP clients would have competent counsel

15   going forward.   To guarantee that competent counsel was provided to

16   Mr. DeCasas and the other SVP clients, the County of Los Angeles

17   agreed to provide the PD's Office additional resources to increase the

18   attorney and staff levels so as to "ensure that these SVP clients would

19   have competent representation and that they would not be deprived of

20   due process because of lack of County, attorney and judicial resources".

21   The County of Los Angeles provided the additional resources to the

22   PD's Office in 2008. Defendant Ridley-Thomas, Ronald Brown and the

23   other managers and administrators of the PD's Office, however, did not

24   apply these resources to the SVP unit.  Nothing changed in the SVP

25   Unit, accordingly.  Defendant Ridley-Thomas, Ronald Brown and the

26   other managers and administrators of the PD's Office knew if they did

27   not apply the additional resources to the SVP Unit, that overwhelming

28

workload would persist within the unit, and that the SVP clients, including Mr. DeCasas, would continue to be denied their due process rights and their speedy trial rights. Despite this, Defendant Ridley-Thomas allowed the resources to be used for other purposes by the PD's Office and allowed the overwhelmed environment to persist in the SVP Unit. The above agreements and history are memorialized, in part, in the Memorandum of Understanding which is attached hereto as Exhibit 1.[1]

m.   Beginning in 2006, and throughout the eight following years, defendant Ridley-Thomas, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office. During many of these meetings, they discussed Mr. DeCasas's case. Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year. They accepted that the SVP clients would not be getting a speedy trial. They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed. In discussing Mr. DeCasas's case, they all agreed that his mental illness made him even less likely to protest the denial of his rights.

n.   From 2006 until 2014, less than four SVP cases were brought to trial annually by the attorneys in the SVP Unit. Mr. DeCasas's SVP case was eight years old in 2014 and he had been waiting for his trial eight years

_____

[1] Defendant Michael Suzuki was the representative from the PD's Office who signed the MOU on behalf of the PD's Office, and he participated in the formulation, adoption and implementation of this MOU.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   in custody.  During each of those years, defendant Ridley-Thomas,
2   Ronald Brown and the other managers and administrators of the PD's
3   Office discussed the status of his case, acknowledged that it was not
4   moving to trial in a timely manner, and agreed that they would not
5   declare "unavailability" in Mr. DeCasas's case so as to ensure that he
6   would be assigned to private counsel to move his case to trial promptly.
7   o.   In 2014, defendant Ridley-Thomas learned that the PD's Office would
8        be cutting the staff level of the SVP unit by at least 50 percent.
9        Defendant Ridley-Thomas learned from defendant Ronald Brown and
10       the other managers and administrators of the PD's Office that this would
11       cause the already-existing delay in the processing of cases to trial to be
12       drastically exacerbated.  In discussing the staff reduction, defendant
13       Ridley-Thomas learned that Mr. DeCasas's case would be further
14       delayed.  He and Ronald Brown and the other managers and
15       administrators of the PD's Office acknowledged that the staff reduction
16       would cause Mr. DeCasas to remain in custody for an indefinite amount
17       of time because the staff reduction would essentially put a stop to the
18       processing of cases by the SVP staff because they simply had too many
19       cases to effectively handle.
20   p.   During the time that the SVP staff reduction was being contemplated
21        during January through April of 2014, this defendant received letters and
22        memoranda from the attorneys and staff in the SVP Unit which informed
23        this defendant that the proposed staff reductions would make them
24        ineffective under law in their ability to assist their SVP clients.  The
25        letters and memoranda, all of which were hand-delivered to this
26        defendant, informed this defendant that the reduction in staff would
27        cause the further delay in the already unconscionably and
28

25
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. DeCasas's case was already at least eight years old and that the staff reductions in the SVP unit would cause Mr. DeCasas's case to remain in limbo, without trial, for an indefinite period of time thereafter.

q.     In the discussion of the impact of the staff reductions during March and April of 2014, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. DeCasas's case.  This would have ensured that his case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. DeCasas's case, thereby essentially abandoning Mr. DeCasas's case to an indefinite state of delay.

r.     During the discussion of the issuance of a declaration of unavailability in Mr. DeCasas's case, defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. DeCasas because his case was now inordinately old – 8 years,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    and that the delay in bringing his case to trial was due to their chronic

2    mismanagement of the SVP Unit, including the breached

3    agreement/MOU of 2007.  Rather than inform the court of the conflict of

4    interest or declare the PD's Office unavailable in Mr. DeCasas's case,

5    defendant Ridley-Thomas, Ronald Brown and the other managers and

6    administrators of the PD's Office agreed to retain Mr. DeCasas's case

7    within the SVP Unit so as to conceal their conflict of interest and avoid

8    civil liability.

9    21.   Defendant Hilda Solis:

10   a.    At all times relevant hereto defendant Hilda Solis was a resident of the

11         County of Los Angeles.  She is and has been a member of the Board of

12         Supervisors of Los Angeles County since 2014.  As part of her duties as

13         a member of the Los Angeles County Board of Supervisors, she was

14         assigned with the administrative responsibility of directly overseeing,

15         managing, directing and/or controlling defendant Law Offices of the Los

16         Angeles County Public Defender.  With respect to her oversight,

17         management and supervision of the Law Offices of the Los Angeles

18         County Public Defender, Hilda Solis did not have to seek authorization

19         from the Board of Supervisors for her decisions, none of such decisions

20         were required to be put before the Board of Supervisors for approval in

21         the form of resolutions, policy determinations or other legislative acts.

22         The acts and omissions of Hilda Solis alleged herein were made on a

23         case-by-case basis.

24   b.    With respect to all conduct alleged herein, defendant Hilda Solis acted

25         under the color of law.

26   ////

27   ////

28

27
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.     Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Hilda Solis had the authority to:

    i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

    ii.   develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

    iii.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

    iv.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.     Defendant Hilda Solis oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Hilda Solis had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific SVP cases. The PD's office often declared "unavailability" in non-SVP cases with the consent of defendant Hilda Solis.

e.   These regular meetings included discussions of the SVP Unit, its case load, individual cases handled by said unit - including Mr. DeCasas's case, the backlog of work in the unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained.

f.   Defendant Hilda Solis requested and received regular memoranda, emails, reports, budget requests, and other written correspondence and documents from defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and other members of the Public Defender's Office regarding the management and operation of the SVP Unit, including the status of Mr. DeCasas's civil detention proceedings. Defendant Hilda Solis had specific knowledge regarding Plaintiff's civil detention proceedings and, as spelled out herein below, was deliberately indifferent to the violation of Mr. DeCasas's civil rights.   Defendant Hilda Solis was aware of the present plaintiff's SVP case, the long delay in getting his case to trial, and the unconstitutional customs and practices which caused the delays in getting Plaintiff's case to trial.

g.   Defendant Hilda Solis is sued in her personal capacity as a supervisor and administrator for her own culpable action or inaction related to the management of Mr. DeCasas's case, and for her specific conduct and deliberate indifference which resulted in the violation of the present Plaintiff's constitutional rights.  She is also sued in her personal capacity

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for her conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of specific conduct carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.  With respect to the individual cases handled by the PD's office, defendant Hilda Solis often managed individual cases that were being handled by the PD's Office.  In her role as a supervisor and administrator of the Office of the Public Defender, she was allowed to, and did, deal with individual cases that were assigned to the PD's office.  This defendant would either request that the client's file be brought to her office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. She would instruct the Ronald Brown and hersubordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.

i.  In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    of the PD's Office. This defendant was informed of the SVP cases that

2    had been awaiting trial the longest and she learned of Mr. DeCasas's

3    case as it was one of the oldest pending cases.  She was informed that if

4    private counsel was not appointed for Mr. DeCasas, his case would

5    linger indefinitely in the PD's office without going to trial because the

6    PD's Office was overwhelmed with cases much older than Mr.

7    DeCasas's case.

8    j.    Between 2014 and 2018, defendant Hilda Solis, Ronald Brown and the

9          PD's managers and administrators continued to meet every month to

10         discuss the management of the PD's Office.  During many of these

11         meetings, they discussed Mr. DeCasas's case.   Defendant Ridley-

12         Thomas, Ronald Brown and the other managers and administrators of

13         the PD's Office recognized at each meeting that the SVP Unit was

14         overwhelmed with work and that the delays in cases getting to trial were

15         continuing to grow every year.  They accepted that the SVP clients

16         would not be getting a speedy trial.  They agreed that because of the

17         unsavory allegations against these clients, that there would be little

18         negative consequences to them if the SVP cases were delayed.  In

19         discussing Mr. DeCasas's case, they all agreed that his mental illness

20         made him even less likely to protest the denial of his rights.

21   k.    In 2014, defendant Hilda Solis learned that the PD's Office would be

22         cutting the staff level of the SVP unit by at least 50 percent.  This

23         concerned defendant Solis given that she had been just informed of the

24         great delays in the bringing of the SVP cases to trial.  Defendant Ridley-

25         Thomas Hilda Solis learned from defendant Ronald Brown and the other

26         managers and administrators of the PD's Office that this would cause the

27         already-existing delay in the processing of cases to trial to be drastically

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

exacerbated.  In discussing the staff reduction, defendant Hilda Solis learned that Mr. DeCasas's case would be further delayed.  She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. DeCasas to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l.   During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. DeCasas's case was already at least eight years old in 2014 and that the staff reductions in the SVP unit would cause Mr. DeCasas's case to remain in limbo, without trial, for an indefinite period of time thereafter.

m.   In the discussions of the impact of the staff reductions during March and April of 2014, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of PD's Office declaring "unavailability" in Mr. DeCasas's case.  This

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

would have ensured that his case would have gotten to trial in speedy fashion after being transferred to private counsel.   This option was viable, but because of a conflict of interest, this defendant decided that the PD's Office would not declare a conflict in Mr. DeCasas's case, thereby essentially abandoning Mr. DeCasas's case to an indefinite state of delay.

n.   During the discussion of the issuance of a declaration of unavailability in Mr. DeCasas's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office discussed the implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it was held that a delay as short as 11 months in the bringing of an SVP case to trial could constitute a violation of due process rights and speedy trial rights.   During their discussions in March and April of 2014, these defendants acknowledged that they were now in a conflict of interest with Mr. DeCasas because his case was now inordinately old – 8 years, and that the delay in bringing his case to trial was due to their chronic mismanagement of the SVP Unit, including the breached agreement/MOU of 2007, which was explained to this defendant. Rather than inform the court of the conflict of interest or declare the PD's Office unavailable in Mr. DeCasas's case, defendant Hilda Solis, Ronald Brown and the other managers and administrators of the PD's Office agreed to retain Mr. DeCasas's case within the SVP Unit so as to conceal their conflict of interest and avoid civil liability.

o.   In March and April of 2014, this defendant was also informed of pending litigation against the state of California regarding the funding for SVP cases.  The state had withdrawn or limited the amount of funding that it had previously disbursed to counties.  The County of Los

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    Angeles was suing the State to have the funding levels reinstated.

2    Through the discussion of this litigation, defendant Solis was further

3    informed that the SVP Unit at the PD's Office was dramatically under

4    understaffed, that the work load exceeded the attorneys' ability to

5    effectively manage their cases, that SVP clients were being so neglected

6    that their cases were being delayed to such an extent that the clients'

7    constitutional rights were being violated, and that Mr. DeCasas's case

8    was one of these neglected cases.

9    22.   Defendant Sheila Kuehl:

10   a.    At all times relevant hereto defendant Sheila Kuehl was a resident of the

11   County of Los Angeles.  She is and has been a member of the Board of

12   Supervisors of Los Angeles County since 2014.  As part of her duties as

13   a member of the Los Angeles County Board of Supervisors, she was

14   assigned with the administrative responsibility of directly overseeing,

15   managing, directing and/or controlling defendant Law Offices of the Los

16   Angeles County Public Defender.  With respect to her oversight,

17   management and supervision of the Law Offices of the Los Angeles

18   County Public Defender, Sheila Kuehl did not have to seek authorization

19   from the Board of Supervisors for her decisions, none of such decisions

20   were required to be put before the Board of Supervisors for approval in

21   the form of resolutions, policy determinations or other legislative acts.

22   The acts and omissions of Sheila Kuehl alleged herein were made on a

23   case-by-case basis.

24   b.    With respect to all conduct alleged herein, defendant Sheila Kuehl acted

25   under the color of law.

26   ////

27   ////

28

34

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

c.   Per her responsibilities to manage, supervise and administer the Law Offices of the Los Angeles County Public Defender and its SVP Unit, Defendant Sheila Kuehl had the authority to:

    i.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to declare that the public defender's office is "unavailable" and thereby have a case assigned to The Alternate Public Defender of Los Angeles County or to a private panel attorney;

    ii.   develop and implement specific training programs for all personnel in the Law Offices of the Los Angeles County Public Defender, including deputy public defenders,

    iii.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to replace or reassign personnel within the Law Offices of the Los Angeles County Public Defender; and,

    iv.   instruct Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to order subordinate personnel, to take specific actions in particular cases.

d.   Defendant Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out her oversight of said office, he met monthly, and often more regularly, with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss and carry out the operation and management of The Law Offices of the Los Angeles County Public Defender.  At all relevant times hereto, Defendant Sheila Kuehl had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants

35

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael

2    Suzuki, Daniel Kuperberg and Ruben Marquez to "declare

3    unavailability" in specific SVP cases.  The PD's office often declared

4    "unavailability" in non-SVP cases with the consent of defendant Sheila

5    Kuehl.

6    e.    These regular meetings included discussions of the SVP Unit, its case

7          load, individual cases handled by said unit - including Mr. DeCasas's

8          case, the backlog of work in the unit, the understaffing of that unit, and

9          the extended time periods that SVP Unit clients were being detained.

10   f.    Defendant Sheila Kuehl requested and received regular memoranda,

11         emails, reports, budget requests, and other written correspondence and

12         documents from defendants Ronald Brown, Kelly Emling, Laura Green,

13         Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez

14         and other members of the Public Defender's Office regarding the

15         management and operation of the SVP Unit, including the status of Mr.

16         DeCasas's civil detention proceedings. Defendant Sheila Kuehl had

17         specific knowledge regarding Plaintiff's civil detention proceedings and,

18         as spelled out herein below, was deliberately indifferent to the violation

19         of Mr. DeCasas's civil rights.   Defendant Sheila Kuehl was aware of the

20         present plaintiff's SVP case, the long delay in getting herecase to trial,

21         and the unconstitutional customs and practices which caused the delays

22         in getting Plaintiff's case to trial.

23   g.    Defendant Sheila Kuehl is sued in her personal capacity as a supervisor

24         and administrator for her own culpable action or inaction related to the

25         management of Mr. DeCasas's case, and for her specific conduct and

26         deliberate indifference which resulted in the violation of the present

27         Plaintiff's constitutional rights.  She is also sued in her personal capacity

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

for her acquiescence in, and ratification of, the constitutional deprivations which this complaint alleges and for her conduct which showed a reckless or callous indifference to the rights of the present plaintiff.  This defendant's affirmative conduct, as described herein below, involves her acquiescence to, and ratification of specific conduct carried out by her subordinates which this defendant knew, or should have known, would inflict a constitutional violation upon the present plaintiff.

h.   With respect to the individual cases handled by the PD's office, defendant Sheila Kuehl often managed individual cases that were being handled by the PD's Office.  In her role as a supervisor and administrator of the Office of the Public Defender, she was allowed to, and did, deal with individual cases that were assigned to the PD's office. This defendant would either request that the client's file be brought to her office or inquire directly with Ronald Brown, or other supervisors in the PD's Office as to individual cases. She would instruct the Ronald Brown and her subordinates as to the management of the case, push for a particular outcome, and demand that the particular case be resolved in a particular way.

i.   In 2014, upon her taking office as a member of the Board of Supervisors and taking on her role as an administrator of the PD's Office, this defendant learned that the PD's Office could not bring SVP cases to trial because the volume of cases had overwhelmed the SVP staff and they could not process the cases to trial in a reasonable time and that as a result, a significant backlog of cases had arisen.   This defendant was informed by Ronald Brown and the PD's managers and administrators that there existed in since 2006 a large backlog of cases in the SVP Unit

of the PD's Office. This defendant was informed of the SVP cases that had been awaiting trial the longest and she learned of Mr. DeCasas's case as it was one of the oldest pending cases. She was informed that if private counsel was not appointed for Mr. DeCasas, his case would linger indefinitely in the PD's office without going to trial because the PD's Office was overwhelmed with cases much older than Mr. DeCasas's case.

j. Between 2014 and 2018, defendant Sheila Kuehl, Ronald Brown and the PD's managers and administrators continued to meet every month to discuss the management of the PD's Office. During many of these meetings, they discussed Mr. DeCasas's case. Defendant Ridley-Thomas, Ronald Brown and the other managers and administrators of the PD's Office recognized at each meeting that the SVP Unit was overwhelmed with work and that the delays in cases getting to trial were continuing to grow every year. They accepted that the SVP clients would not be getting a speedy trial. They agreed that because of the unsavory allegations against these clients, that there would be little negative consequences to them if the SVP cases were delayed. In discussing Mr. DeCasas's case, they all agreed that his mental illness made him even less likely to protest the denial of his rights.

k. In 2014, defendant Sheila Kuehl learned that the PD's Office would be cutting the staff level of the SVP unit by at least 50 percent. This concerned defendant Solis given that she had been just informed of the great delays in the bringing of the SVP cases to trial. Defendant Ridley-Thomas Sheila Kuehl learned from defendant Ronald Brown and the other managers and administrators of the PD's Office that this would cause the already-existing delay in the processing of cases to trial to be

drastically exacerbated.  In discussing the staff reduction, defendant Sheila Kuehl learned that Mr. DeCasas's case would be further delayed. She and Ronald Brown and the other managers and administrators of the PD's Office acknowledged that the staff reduction would cause Mr. DeCasas to remain in custody for an indefinite amount of time because the staff reduction would essentially put a stop to the processing of cases by the SVP staff because they simply had too many cases to effectively handle.

l.   During the time that the SVP staff reduction was being contemplated during January through April of 2014, this defendant received letters and memoranda from the attorneys and staff in the SVP Unit which informed this defendant that the proposed staff reductions would make them ineffective under law in their ability to assist their SVP clients.  The letters and memoranda, all of which were hand-delivered to this defendant, informed this defendant that the reduction in staff would cause the further delay in the already unconscionably and unconstitutionally slow processing of the SVP cases.  The letters and memoranda expressly informed this defendant that the staff reductions would cause the violation of the due process rights and speedy trial rights of the SVP clients.   During the regular monthly discussions about the management of the PD's Office, this defendant learned that Mr. DeCasas's case was already at least eight years old in 2014 and that the staff reductions in the SVP unit would cause Mr. DeCasas's case to remain in limbo, without trial, for an indefinite period of time thereafter.

m.   In the discussions of the impact of the staff reductions during March and April of 2014, defendant Sheila Kuehl, Ronald Brown and the other managers and administrators of the PD's Office discussed the option of

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

PD's Office declaring "unavailability" in Mr. DeCasas's case.  This
would have ensured that his case would have gotten to trial in speedy
fashion after being transferred to private counsel.   This option was
viable, but because of a conflict of interest, this defendant decided that
the PD's Office would not declare a conflict in Mr. DeCasas's case,
thereby essentially abandoning Mr. DeCasas's case to an indefinite state
of delay.

n.     During the discussion of the issuance of a declaration of unavailability in
Mr. DeCasas's case, defendant Sheila Kuehl, Ronald Brown and the
other managers and administrators of the PD's Office discussed the
implications of *People v. Litmon*, (2008) 76 Cal. Rptr. 3d 122, where it
was held that a delay as short as 11 months in the bringing of an SVP
case to trial could constitute a violation of due process rights and speedy
trial rights.   During their discussions in March and April of 2014, these
defendants acknowledged that they were now in a conflict of interest
with Mr. DeCasas because his case was now inordinately old – 8 years,
and that the delay in bringing his case to trial was due to their chronic
mismanagement of the SVP Unit, including the breached
agreement/MOU of 2007, which was explained to this defendant.
Rather than inform the court of the conflict of interest or declare the
PD's Office unavailable in Mr. DeCasas's case, defendant Sheila Kuehl,
Ronald Brown and the other managers and administrators of the PD's
Office agreed to retain Mr. DeCasas's case within the SVP Unit so as to
conceal their conflict of interest and avoid civil liability.

o.     In March and April of 2014, this defendant was also informed of
pending litigation against the state of California regarding the funding
for SVP cases.  The state had withdrawn or limited the amount of

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

funding that it had previously disbursed to counties.  The County of Los
Angeles was suing the State to have the funding levels reinstated.
Through the discussion of this litigation, defendant Solis was further
informed that the SVP Unit at the PD's Office was dramatically under
understaffed, that the work load exceeded the attorneys' ability to
effectively manage their cases, that SVP clients were being so neglected
that their cases were being delayed to such an extent that the clients'
constitutional rights were being violated, and that Mr. DeCasas's case
was one of these neglected cases.

### Public Entity Defendants

23.     Defendant County of Los Angeles:  At all times mentioned herein,
defendant County of Los Angeles was a public entity duly organized and existing
under and by virtue of the laws of the state of California, with the capacity to sue and
be sued.  Defendant County of Los Angeles is responsible for the actions, omissions,
policies, procedures, practices and customs of its various agents, departments,
subdivisions and agencies.  Defendant County of Los Angeles operates, manages,
directs and/or controls defendant Law offices of the Los Angeles County Public
Defender which is also a separate public entity. At all times relevant to the facts
alleged herein, Defendant County of Los Angeles was responsible for assuring that
the actions, omissions, policies, procedures, practices and customs of its departments,
subdivisions, and employees, complied with Constitution of the United States.

24.     Defendant Law office of the Los Angeles County Public Defender: At
all times mentioned herein, defendant Law offices of the Los Angeles County Public
Defender was a public entity, and subdivision of the County of Los Angeles, duly
organized and existing under and by virtue of the laws of the state of California and
the Charter of the County of Los Angeles, with the capacity to sue and be sued.
Defendant Law Offices of the Los Angeles County Public Defender is responsible for

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

the actions, omissions, policies, procedures, practices and customs of its various agents, departments, subdivisions and Units, including its SVP Unit. According to defendant Law Offices of the Los Angeles County Public Defender, its SVP Unit was established to defend those persons who were being committed to state mental institutions for potentially an indefinite term of commitment, and that its SVP Unit consists of experienced attorneys and paralegals practicing exclusively in this highly specialized area of law.

25.    DOE defendants 1 through 10, inclusive and each of them, are and were at all times relevant here, members of the Los Angeles County Board of Supervisors, appointed or elected officials of the County of Los Angeles, and agents, employees and/or representatives of defendant County of Los Angeles acting within their capacity as employees, agents and servants of the defendant County of Los Angeles and/or Law Offices of the Los Angeles County Public Defender.  Said defendants were policy-makers with the authority to develop, modify, amend, ratify, implement, revoke, and rescind all policies, practices, procedures and customs of the Law Offices of the Los Angeles County Public Defender.  Said defendants at all times alleged herein where acting within said course and scope of that employment and agency, and at all times relevant hereto were acting under the color of law.  Said Defendants are sued individually and in their personal capacity as supervisors, employees, agents and/or representatives of defendant County of Los Angeles.

26.    The present plaintiff is ignorant of the true names and capacities of defendants sued herein as DOE defendants 1 through 10, inclusive, and therefore sues these defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's

injuries as herein alleged were proximately caused by the acts and/or omissions of said fictitiously named defendants.

## V.

## STATEMENT OF RELEVANT FACTS

### A.

**The Los Angeles County Superior Court has determined that Mr. DeCasas's Due Process rights were violated by the 13-year pre-trial detention.**

27.  On August 20, 2019, the Honorable William C. Ryan, Judge of the Los Angeles County Superior Court, issued an order finding that the 13-year pre-trial detention of Mr. DeCasas violated his due process rights under the Fourteenth Amendment of the US Constitution, and he dismissed the petition for civil detention which was filed on November 2, 2006.

28.  Judge Ryan's order notes that an 11-month delay in getting to trial on an SVP petition may alone violate a detainee's due process rights, citing *People v. Litmon (Litmon II)*, (2008) 162 Cal. App. 4th 1, 27.  Judge Ryan further noted that a delay of over five years was "extraordinary," citing *Barker v. Wingo*, (1972) 407 U.S. 514, 53.  And, a "17-year delay before trial is by any measure an "extraordinary" delay that triggers the *Barker* inquiry and weighs against the [defendant]."  *People v. Superior Court*, (2018) 27 Cal.App.5th 36, 61 (*Vasquez*).

29.  As part of the hearing in determining whether Mr. DeCasas's due process rights had been violated, Judge Ryan heard testimony from the three Deputy Public Defenders that had represented Mr. DeCasas.

30.  Guided by *Vasquez* and *Litmon*, in order to determine if there has been a violation of plaintiff's due process rights and speedy trial rights, Judge Ryan applied the tests established by the United States Supreme Court in *Mathews v. Eldridge*,

(1976) 424 U.S. 319 and *Barker v. Wingo*, (1972) 407 U.S. 514, and the court concluded as follows:

a.     Mr. DeCasas's 13 years of pre-trial confinement constituted a pretrial delay and the presumes the delay prejudiced Mr. De Casa, requiring due process protection;

b.     Mr. DeCasas, on the advice of his attorney, did not appear at court for pre-trial hearings from 2006 until 2011, and not regularly until 2017, and he could not have been reasonably expected to assert his speedy trial rights;

c.     Mr. DeCasas expressed frustration when his counsel discussed the need for more preparation time and expressed a desire "to get out;"

d.     Like *Vasquez*[2], Mr. DeCasas was forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to speedy trial.  He had the proverbial "Hobson's choice;"

e.     Had his case been brought to trial in a timely fashion and had he been committed, he would have been committed for only a two-year period;

f.     There existed no fiscal or administrative burdens on the government that could have possibly justified the lengthy pre-trial detention suffered by Mr. DeCasas;

g.     The 13-year delay was presumptively prejudicial and caused an oppressive period of pretrial confinement.  The delay was presumptively prejudicial regardless of the continual positive evaluations Mr. DeCasas

---

[2] The appellant in *Vasquez*, George Vasquez, was also represented by the Los Angeles County Public Defenders' Office, including by many of the same attorneys, and he spent 17 years in custody awaiting trial in his SVP proceedings.  Both Mr. Vasquez and Mr. DeCasas were concurrently in SVP proceedings at the time that the Los Angeles County Public Defenders' office has been deemed to have been in a state of a "systemic breakdown."

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

received.  Judge Ryan's order noted that the unanimity of the evaluators in giving positive evaluations to Mr. DeCasas was of no import in his analysis; and,

h.   The "extraordinary" length of the delay resulted from "a systemic 'breakdown in the public defender system.'"

31.   The court concluded that the lengthy detention was not of Mr. DeCasas's own making, that Mr. DeCasas made it clear that he wanted to "get out" while his public defender waived his appearances and stipulated to continuances for years at a time, and that he was faced with a Hobson's choice of acquiescing to his attorney's strategies, whatever they were, or go to trial with an attorney that was not timely prepared.  As such, the court rejected the argument that Mr. DeCasas was responsible for the long delay.

32.   Ultimately, the court concluded that the long 13-year pre-trial detention of Mr. DeCasas was presumptively prejudicial and that such detention violated his due process rights.

**B.**

**The Court of Appeal of the State of California**

**Affirmed that Mr. DeCasas's constitutional rights were violated.**

33.   On September 17, 2020, the Court of Appeal of the State of California, Second Appellate District, issued a published opinion which affirmed the dismissal of Mr. DeCasas's SVP proceedings and affirmed the conclusions of the trial court that Mr. DeCasas's right to due process and right to a speedy trial were violated by the conduct of the long delay in bringing his SVP case to trial.  *See generally, People v. DeCasas*, 2020 Cal. App. LEXIS 879.  The Court of Appeal also elaborated and emphasized various underlying circumstances related to Mr. DeCasas's case, which include the following:

a.   Mr. DeCasas was not happy with the delays and did not understand the reasons for the delays;

b.   Mr. DeCasas faced a Hobson's choice as he was forced to acquiesce to his counsel's demand for more time and forced to choose between proceeding to trial without prepared counsel or giving up his right to a speeding trial.

c.   There is substantial evidence to support the trial court's finding that a systemic breakdown in the public defender's office caused delays in the SVP cases, including Mr. DeCasas's case.

d.   Little training was provided to incoming SVP attorneys.

e.   It is questionable whether Mr. DeCasas satisfied the criteria under the SVP Act given the opinions of two defense experts.

**C.**

**By 2006, there was an institutional breakdown of the Public Defender System in Los Angeles County.**

34.   In the *Vasquez* case, both the trial court and the Court of Appeal of the State of California concluded that "the dysfunctional manner in which the public defender's office handled … Vasquez's case was precisely the type of systemic or institutional breakdown contemplated [by controlling authority]." *Vasquez*, 27 Cal. App. 5th at 73.

35.   A state of institutional breakdown existed as early as 2006 in the PD's Office.  In 2007, the Superior Court of Los Angeles County brokered an agreement with the PD's Office and the Office of the District Attorney to attempt to address the inability of the PD's Office to bring SVP cases to trial. In the Memorandum of Understanding that memorialized the agreement, the parties stipulated to the inability of the PD's Office to promptly bring SVP cases to trial.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

36.    The agreement resulted from the enactment of new legislation in October of 2006 related to SVP proceedings and the term of commitment for those individuals who were adjudicated under the SVP Act. The new legislation made the term of commitment indefinite rather than two years.  The legislation applied to 64 pending SVP petitions which were being defended against by the PD's Office.   Mr. DeCasas's case was one of those 64 cases.

37.    This agreement provided that the PD's Office would bring the 64 cases to trial within 24 months.  The majority of the cases subject to this agreement were at least three years old by the time the agreement was entered into.

38.    Shortly after entering into the agreement, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez determined that the SVP unit did not have the staff and other resources to bring the 64 cases to trial within the 24 months they had agreed to.   This put the 64 SVP clients at risk of losing the benefit of the two-year commitment term. Likewise, this also put the PD's Office in conflict of interest.  The lawyers in the SVP unit had to choose which clients would go to trial in the 24-month period and which clients would not.

39.    Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez realized that this created an ethical and liability problem for them and the PD's Office.  Accordingly, they sought to be relieved as counsel in the 64 cases, including Mr. DeCasas's case.

40.    These defendants did not inform Mr. DeCasas or the other 63 SVP clients of this agreement, of their intention to be relieved as counselor of the implications of not brining their cases to trial within 24 months, including the impact of being committed to state civil detention for an indefinite period.

41.    After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

assume representation of the SVP clients that the PD's Office was unable to handle. SVP litigation was, and is, meaningfully different than normal criminal defense work. SVP cases consist of voluminous files, complex medical issues are intertwined with the legal issues, and extensive expert evaluations are essential to the successful defense of these cases.  Although brought by prosecutors and pursued in the criminal courts, SVP cases are civil cases with all the proceedings common in civil litigation that are, for the most part, foreign to criminal practitioners, such as the taking of depositions.   The field is so specialized that very few private practitioners in California practice SVP defense.

42.     Because the court could not find adequate numbers of private attorneys to handle the subject 64 cases, the court, the PD's Office and the DA's office entered into another agreement regarding Mr. DeCasas's case and the other 63 cases.  The District Attorney's Office offered to withdraw the 24-month time limit to bring the cases to trial, if the PD's Office agreed to retain the cases.  The agreement, however, also provided that the 64 SVP clients waive their right to have their case brought to trial promptly, within the 24-month period, so as to avoid indefinite commitment. Defendant Michael Suzuki was the representative from the PD's Office that signed the memorandum of understanding.

43.     The intention of the agreement was to ensure that Mr. DeCasas and the other 63 SVP clients would have "competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources."  This intent was never honored by the County of Los Angeles, the PD's Office, or defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez

44.     Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez accepted this agreement and agreed to retain all of the 64 cases.  They did not notify Mr. DeCasas, or the other 64

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    SVP clients, that they had waived their right to speedy trial and that the PD's Office

2    had agreed to risk their indefinite commitment.

3            45.    The agreement was memorialized in a memorandum of understanding in

4    May of 2007 and provided for the continuing representation by the PD's Office of

5    Mr. DeCasas and the other 63 SVP clients that were subject to the new legislation.

6    The previously-agreed-to 24-month time period to bring Mr. DeCasas's case to trial

7    was waived by the PD's Office and the County of Los Angeles agreed to provide

8    additional resources to the PD's Office to enable the PD's Office to handle the

9    increased workload and so these cases would be brought to trial promptly and

10   competently.

11           46.    The County of Los Angeles provided more than $1,200,000 to the Public

12   Defender's Office to ensure that the retained SVP cases would be competently

13   brought to trial.  The PD's Office and defendants Ronald Brown, Jenny Brown, Kelly

14   Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez

15   accepted these resources but did not dedicate any of the funding to the SVP unit.

16   They did not hire or transfer new lawyers to work in the SVP Unit nor did they did

17   change the way they managed SVP cases.  They did not modify the structure of the

18   SVP Unit in any way, or otherwise meaningfully change the way they defended SVP

19   cases so as to ensure that their SVP clients would receive "competent representation

20   and that they would not be deprived of due process because of a lack of County,

21   attorney and judicial resources."

22           47.    To the contrary, nothing changed.  The admitted inability to bring these

23   cases to trial promptly, the conflicts of interest, and the essential abandonment of

24   their SVP clients persisted.  Mr. DeCasas's case remained with the SVP Unit. After

25   his probable cause hearing, he was not contacted by any lawyer from the SVP Unit

26   within the first five years after he was transferred to the state hospital system.  Not

27   until 2018, when private counsel was appointed to represent Mr. DeCasas, did he

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    have any meaningful work done on his case. Shortly thereafter, his case was

2    dismissed.

3        48.    From 2007, when the above agreement was entered into, until

4    approximately April of 2014, the SVP unit remained under-staffed, overworked and

5    unable to handle the amount of SVP cases that were assigned to it.  None of the 64

6    cases, including Mr. DeCasas's case, were brought to trial in the previously

7    contemplated 24-months.  In fact, because of the overwhelming amount of cases and

8    related work that each of the lawyers in the SVP Unit had to manage, between 2007

9    and 2014 less than four SVP cases were brought to trial each year by the PD's Office.

10   The same institutional breakdown that the courts have recognized as having existed in

11   the PD's Office between 2014 and 2018 also existed between 2006 to 20014.

12                                      **D.**

13              **Plaintiff's 13-year ordeal as an SVP pre-trial detainee.**

14       49.    Mr. DeCasas served a 7-year sentence in state prison.  Near the end of

15   his sentence, and before he was released from prison, the Los Angeles County

16   District Attorney's office filed a petition for civil commitment pursuant to California

17   *Welfare & Institutions Code*, section 6600 et seq.  On November 1, 2006, the

18   Superior Court issued an order for Mr. DeCasas's removal from prison so he could be

19   arraigned on the petition.

20       50.    Throughout Mr. DeCasas's 13-year detention, he was represented by

21   attorneys from the Public Defender's Office.

22       51.    During his entire period of detention as a pre-trial SVP detainee, Mr.

23   DeCasas was force medicated due.

24       52.    The heavy medication and/or mental illness made it difficult for Mr.

25   DeCasas to communicate.  Despite this, none of the lawyers from the PD's office

26   made any effort to meaningfully communicate with him about his case until 2017.

27   Up until then, there was no evaluation done by any of the lawyers from the PD's

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Office as to his competency.  Because of this failure, the attorneys from the PD's officer were not even able to take the first step in determining competency by "declaring a doubt" as to Mr. DeCasas's mental competence under Penal Code § 1368.

53.     The first Deputy Public Defender that represented Mr. DeCasas began his representation in 2006 and continued for approximately one year.  This Deputy Public Defender (hereafter "DPD1") eventually went on to serve as the Deputy-In-Charge of the Public Defender's Office SVP unit from approximately 2009 through about 2015.  DPD1 is not a defendant in the present action.

54.     On November 16, 2006, at arraignment on the Petition, DPD1 was appointed as counsel for Mr. DeCasas, who was present in court. Both DPD1 and the Deputy District Attorney submitted on the doctors' reports attached to the Petition.

55.     DPD1 waived Mr. DeCasas right to a probable cause hearing.  This was done pursuant to a custom and practice then in place at the Public Defender's Office whereby probable cause was not challenged in SVP cases and whereby various affirmative defenses were not pursued.  This custom and practice included a failure to challenge the defense experts' reliance on hearsay evidence, and, a failure to challenge whether deportable foreign nationals even qualified as possible SVP's.

56.     Based on the Petition and reports, the court found probable cause to support the Petition and ordered Mr. DeCasas remanded to the custody of the Department of State Hospitals ("DSH") pending trial.

57.     In the underlying proceedings related to Mr. DeCasas's motion to dismiss the SVP petition (hereafter the "*Litmon/Vasquez* proceedings"), DPD1 testified that arraignment took place in Department 83 of the Los Angeles Superior Court, which, at that time, was not equipped with video conferencing.

58.     DPD1 also testified that it was the custom and practice for the SVP Unit to waive their SVP clients' appearances.  He testified that "as a matter of course, we

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1 would encourage our clients to waive their appearances ... the only way for them to

2 make an appearance was to drag them back to and from the hospital ... and rather than

3 do that, it would just be better for them to maintain their place at the hospital while

4 we have our pre-trials."

5      59.    DPD1 recalled that Mr. DeCasas had a *Keyhea* order requiring he be

6 involuntarily medicated, and that it was DPD1's opinion at that time that Mr.

7 DeCasas, with his psychiatric condition, would be better off at Atascadero State

8 Hospital than at Coalinga State Hospital.  The next pretrial hearing was set for

9 January 30, 2007.  DPD1 advised Mr. DeCasas to waive all future pretrial hearings

10 until trial.

11      60.    On January 30, 2007, DPD1 advised the court that the parties were "still

12 working on discovery issues" and called the matter "a relatively new case." The

13 pretrial hearing was continued to April 24, 2007.

14      61.    On April 24, 2007, DPD1 asked that the pretrial hearing be continued to

15 July 17, 2007, calling the matter "a relatively new petition."  The pretrial hearing was

16 continued to July 24, 2007.  On July 16, 2007, the district attorney and DPD1 agreed

17 to continue the pretrial hearing date to September 6, 2007. The reason specified for

18 the inability to be heard on the original date was "Judge is on vacation."

19      62.    At the pretrial hearing on September 6, 2007, the Deputy District

20 Attorney filed an amended Petition to include another charge after the passage of

21 Jessica's Law, which Mr. DeCasas also denied. DPD1 requested a pretrial hearing

22 date of December 11, 2007, as it was "a relatively new case."  The matter was set for

23 that date.

24      63.    Mr. DeCasas's case was then transferred to his second Deputy Public

25 Defender (hereafter "DPD2"), who began his representation of Mr. DeCasas in late

26 2007.

27 ////

28

---

52

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

64.    DPD2 also testified in Mr. DeCasas's *Litmon/Vasquez* proceedings that when he received the client file from DPD1, "not a lot had been done [on the case]." DPD2 also recalled that the evaluations reported that Mr. DeCasas had a "very flat affect," only spoke a few words to the evaluators, and was on heavy medication-observations DPD2 also made himself during his visits with Mr. DeCasas.  DPD2 recalled these in-person conversations with Mr. DeCasas as "not all that productive" and, for the most part, having "no benefit," though there were phone conversations with Mr. DeCasas where he and DPD2 were able to discuss some items.

65.    On December 11, 2007, DPD2 told the court that it was "a relatively new matter" and requested the pretrial hearing be continued to April 8, 2008, to which Deputy District Attorney stipulated.  On April 8, 2008, the District Attorney's Office and DPD2 requested the pretrial hearing be continued to June 26, 2008.

66.    On June 26, 2008, the court inquired when the parties "realistically" saw the matter going to trial. Deputy District Attorney responded, "[a]s far as having the information and - it appears to me having reviewed the case, not in depth, that the People could be ready in a relatively short period of time. Defense, I believe, is new to the case. I am as well. I'm in trial in July and August. So, you know, barring my unavailability, it does not look like a case to me that I need any great amount of time on." DPD2 responded, "Given I have cases that are older, I don't anticipate being ready to go to trial on this matter in 2008. I do hope to proceed on it sometime next year, though." The court set the matter for October 28, 2008, but stated, "I'll expect counsel to tell me, A, if you have reports and B, when they will become stale so we can set realistic dates here for the trial."

67.    On October 28, 2008, the court inquired of DPD2 if depositions had been taken in the matter. DPD2 responded, "Not yet, your honor. I was sort of waiting for the records which the court is not in receipt of. That took a lot longer than expected."  The pretrial hearing was continued to February 23, 2009.  On February

53

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

19, 2009, the District Attorney's Office referred to the Petition's status as "early in the hunt," and the pretrial hearing was continued to July 27, 2009.

68.     On July 27, 2009, the matter was continued to February 19, 2010.  The court asked DPD2 to secure a written waiver from Ms. DeCasas.

69.     On February 19, 2010, DPD2 informed the court that he had not obtained a time or appearance waiver from Mr. DeCasas.  DPD2 proposed to obtain waivers, and the District Attorney's Office agreed to continue the pretrial hearing to April 29,2010.

70.     On April 29, 2010, DPD2 still had not received waivers from Mr. DeCasas and informed the court, "We had it in transit to him . . .That is something we're still working on." As to his anticipated plans, DPD2 relayed, "I'm weighing my options with regards to *Ronje*, given his age ...  I believe based on his age, his Static 99 score may be as low as a 2 now that he is 60, so I am - hopefully with Mr. DeCasas's cooperation, we can hopefully see where this case goes, so perhaps we can trail it to August as well."  The pretrial hearing was continued to August 17, 2010.

71.     DPD2 recalled filing a *Ronje* motion in 2010 on Mr. DeCasas's behalf, in response to which the District Attorney's Office stipulated that Mr. DeCasas was entitled to a new probable cause hearing.  DPD2 stated that he was  "definitely busy with regard to planning and scheduling Ronje P.C. hearings," but despite not having done much of anything to push Mr. DeCasas's case to trial, he did not believe he was overwhelmed until the staffing cuts began and when he later "absorbed many more cases" in 2017.

72.     On August 17, 2010, DPD2 filed the above-referenced *Ronje* motion on behalf of Mr. DeCasas. The court ordered that new evaluations be conducted by the two original evaluators pursuant to *Ronje*. The matter was continued to October 20, 2010, for probable cause hearing setting, and DPD2 waived appearance for Mr. DeCasas.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

73.     On October 20, 2010, the deputy district attorney announced one of the two new evaluation reports was received, which was positive. The parties "jointly" requested to continue the probable cause hearing setting to December 15, 2010. DPD2 represented to the court that Mr. DeCasas waived time and that he was still working on getting a written waiver from Mr. DeCasas.

74.     During the underlying *Litmon/Vasquez* proceedings, DPD2 testified that he did not remember informing the court at the October 20, 2010 that Mr. DeCasas agreed to waive time: "In 2010, I don't think he would agree to anything. So, if I said that, I don't think that actually occurred."  When presented with the transcript of the hearing, DPD2 replied, "I don't recall making that statement, but it's in the transcript. And I think at that point, I had probably not had an actual conversation with Mr. DeCasas at that time. So perhaps I was waiving time on his behalf, but I don't believe I had his permission."

75.     DPD2 testified that the same could be said for the waiver given by DPD2 when the court asked if Mr. DeCasas was willing to waive time at the next court appearance on December 15, 2010.

76.     DPD2 testified that during his representation of Mr. DeCasas, DPD2 did not believe he ever successfully explained to Mr. DeCasas what a "time waiver" was. DPD2 further testified that, in his eyes, DPD2 was waiving time for the benefit of his client so that he could prepare the case.

77.     On December 15, 2010, DPD2 informed the court that the second new evaluation had been received, but that it contained "a drastically different score than the first." DPD2 stated he intended to retain an expert to review the discrepancy between the two evaluations. DPD2 asked that the hearing be continued and stated that Mr. DeCasas waived time. On DPD2's motion, the probable cause hearing setting was continued to March 17, 2011. The court advised DPD2 that if Mr.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

DeCasas is not participating in treatment, it was the court's preference that the case go forward with the probable cause hearing as quickly as possible.

78.    On March 17, 2011, DPD2 informed the court that he was "doing further work on the case" and asked that the probable cause hearing setting be continued to June 16, 2011. The deputy district attorney did not object. No time waiver was taken.

79.    Thereafter, the probable cause hearing was set for June 18 through June 20, 2012.  The setting is not documented in any minute order or transcript; however, the dates were referred to during the May 15, 2011, hearing.

80.    On May 15, 2011, the court convened a hearing on DPD2's motion to continue the June 2012 probable cause hearing based on uncertainty of the composition of DSH's panel of doctors after the end of the fiscal year, including the two doctors who performed Mr. DeCasas's evaluations. DPD2 sought to use the probable cause hearing as an opportunity to cross-examine the evaluators who would remain on the matter through the end of trial. DPD2 stated to the court," ... my primary concern is to preserve [Mr. DeCasas's] right to cross-examine. But I think at this point it may be a sense of futility at this point."

81.    The parties conceded to the court that Mr. DeCasas had the right to depose the current evaluators; however, the deputy district attorney pointed out to the court that " ... in practicality there is not money for that" and stated it " ... makes a lot of sense what DPD2 is trying to do."  The Deputy District Attorney described the financial strapping as follows: "We can't even fund a court reporter, let alone, you know, all of the other facilities that will be required." The court stated, "Based upon the 1050, [my] intention is to grant it if these individuals are not going to remain on the panel. But I would like confirmation since these dates have been set for such a long time, and if we continue these dates, Mr. DeCasas is going to be looking at a relatively lengthy wait." The attorneys indicated that after the end of the fiscal year and after DSH and evaluators agreed on contracts, there would be more clarity

regarding whether' the evaluators would remain. The attorneys also discussed with the court whether it was strategically sound to order updates for the stale evaluations of the current evaluators were not going to remain on the matter.

82.    At the deputy district attorney's prompting, the court inquired whether Mr. DeCasas was waiving his right to "expeditiously" have a probable cause hearing. The court delineated the options as holding a video conference the next day to get a waiver from Mr. DeCasas, allowing DPD2 to obtain a written waiver, or if he had the authority, having DPD2 waive time on Mr. DeCasas's behalf. DPD2 believed he did have the authority based on his paralegal's recent visit with Mr. DeCasas, during which, DPD2 represented to the court, that Mr. DeCasas reluctantly understood the need for the delay. The court expressed concern with the "attenuated" waiver, to which DPD2 did not object. DPD2 pointed out, however, the court could find good cause to continue the hearing even if Mr. DeCasas objected to the continuance based on DPD2's representation of the need to continue.

83.    DPD2 and the deputy district attorney agreed to an August 13, 2012, probable cause status conference, which Mr. DeCasas was to attend via video, and a probable cause hearing on August 12 through 14, 2013. A probable cause status conference was also set for May 21, 2012, for which Mr. DeCasas was to appear via video for waiver of time. The June 2012 probable cause dates were not taken off calendar. The parties reconvened on June 16, 2011. DPD2 waived Mr. DeCasas's appearance but informed the court that Mr. DeCasas wished to be present via video for a future setting date. A further probable cause hearing was set for September 12, 2011.

84.    On September 12, 2011, Mr. DeCasas was present via video for the probable cause hearing setting. DPD2 advised the court that there had been "drastic changes in the use of actuarials" since Mr. DeCasas's last updated evaluations in October 2010, "which may have a significant impact on this case." The original

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  evaluators remained on the matter. DPD2 and the deputy district attorney agreed to a

2  December 7, 2011, status conference, for which Mr. DeCasas would appear via

3  video, and on that date, the court would order updated evaluations.

4       85.    On December 7, 2011, Mr. DeCasas did not appear via video and the

5  hearing went forward without him. DPD2 and the deputy district attorney agreed that

6  the court would order updated evaluations in anticipation of returning on June 18,

7  2012, to begin the probable cause hearing. The attorneys agreed to keep the court

8  apprised if any problems arose.

9       86.    On May 3, 2012, DPD2 filed a motion to continue the June probable

10  cause hearing dates "due to the uncertain nature of the DMH [Department of Mental

11  Health] evaluator panel." The motion was heard on May 15, 2012. A status

12  conference was calendared for May 21, 2012. On May 21, 2012, however, Mr.

13  DeCasas did not appear via video and the hearing was conducted without him.  The

14  June 2012 probable cause hearing dates were vacated, and a status conference was set

15  for August 13, 2012, at which Mr. DeCasas was to appear via video.

16       87.    On May 17, 2012, one of the evaluators responded to DPD2's inquiry,

17  indicating his uncertainty in whether he would sign a new contract with the state

18  hospital because the hospital now was only offering payment for testimony.  The

19  evaluator apologized and explained it was out of his control and "a direct result of the

20  Department's decision and ineptitude."  DPD2 testified in the underlying

21  *Litmon/Vasquez* proceedings that he had to continue the probable cause hearing to

22  2013 due, in part, to the uncertainty with the state evaluator panel.

23       88.    On August 13, 2012, Mr. DeCasas did not appear, and DPD2 waived his

24  appearance. DPD2 and the deputy district attorney agreed to a status conference on

25  May 17, 2013, at which point updated or replacement evaluations would be ordered

26  for the August 2013 probable cause hearing.

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

89.     On May 23, 2013, the court convened a status conference. Mr. DeCasas's presence was waived and the third day of the probable cause hearing was vacated due to the representation that DPD2 did not intend to call witnesses and the deputy district attorney was to submit on the reports. A status conference was calendared for June 27, 2013. Another status conference before the probable cause hearing was held on August 1, 2013. On August 12 and 13, 2013, the court conducted a probable cause hearing and, in Mr. DeCasas's presence via video conference, found probable cause to support the Petition. A pretrial hearing was set for October 17, 2013.

90.     At the October 17, 2013, pretrial hearing, Mr. DeCasas appeared via video conference. DPD2 informed the court that he was in the process of obtaining an expert with whom he had informally begun working, that he had multiple probable cause hearings in other assigned cases at the same time, and that he would not be prepared for trial in the interim. DPD2 and the deputy district attorney agreed to continue the pretrial hearing to December 6, 2013.

91.     After the probable cause hearing, DPD2 tasked his paralegal with obtaining a written waiver of Mr. DeCasas's right to a speedy trial; however, DPD2 is unsure to what extent his paralegal advised Mr. DeCasas of that right. DPD2 and his paralegal were aware that Mr. DeCasas was more lucid at times than at others.  DPD2 testified that the court repeatedly asked that he obtain a written waiver of time and appearance from Mr. DeCasas.  DPD2, however, did not obtain said waivers of time and appearances from Mr. DeCasas.

92.     Shortly after the probable cause hearing, DPD2 received a letter and documents from a Coalinga patient asking DPD2 to look into an immigration issue on Mr. DeCasas's behalf. The documents included a motion to be filed with the court raising a claim regarding immigration and its intersection with SVP law.   DPD2 wrote to Mr. DeCasas explaining that he was extremely busy but that he would do his

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  best to look at the motion. DPD2 testified that he wanted a substantial amount of time

2  to research the issue because it could theoretically affect as many as 25 percent of all

3  the confined SVPs; i.e., those SVP detainees who were foreign nationals.  However,

4  by that time, DPD2 testified, the SVP unit was dealing with staff cuts and numerous

5  reassignments of cases; he received "six new cases in just 2014 alone."

6      93.    On December 6, 2013, DPD2 stated he was still waiting to hear whether

7  the expert he had been communicating with would accept Mr. DeCasas case; he

8  hoped to have the expert's decision "in the next couple of weeks." The court asked the

9  parties to return for further pretrial hearing in one month and urged DPD2 to request

10  to have his expert appointed. The attorneys agreed to return on January 14, 2014, and

11  DPD2 waived Mr. DeCasas's appearance.

12      94.    On January 14, 2014, DPD2 informed the court that the expert had

13  declined to take Mr. DeCasas's case, indicating to DPD2 that some experts no longer

14  wished to work in Los Angeles County because their fees kept being cut. DPD2

15  stated that he was attempting to convince the expert to take on the case; however, if

16  he was unsuccessful, he would have to find an alternate expert. The court responded,

17  "This is a 2006 case, DPD2. We need to get this matter moving toward trial. I will set

18  the case for trial. If you want an expert appointed, then you need to make a request."

19  DPD2 asked for a few more weeks to find an expert to review Mr. DeCasas's

20  materials, after which DPD2 would be prepared to submit a request for appointment.

21  The Deputy District Attorney stated he was ready for trial. The court requested the

22  parties return for further pretrial hearing on February 11, 2014.

23      95.    On February 11, 2014, DPD2 submitted, and the court signed, a request

24  for appointment of an expert. DPD2 asked to continue the pretrial hearing to late

25  April.  DPD2 and the Deputy District Attorney agreed to reconvene on May 2, 2014,

26  and DPD2 waived Mr. DeCasas's appearance.

27

28

60

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

96.     Defendant Michael Suzuki, currently a Division Chief within the Public Defender's Office and previously the head of the SVP unit from 2009 through 2011, testified in the underlying *Litmon/Vasquez* proceedings that in 2013, when he was head deputy in the Long Beach branch, he was consulted on staffing reassignments and decreases in the SVP unit that later took place in 2014.  He testified that he was asked for his opinion as to whether the SVP unit could absorb a decrease in staff based on two things: the decrease in the filing of new petitions and the progress made on existing petitions. Defendant Suzuki testified that during the recession, the Public Defender's Office had experienced both a hiring and promotional freeze and that all divisions, especially the felony trial division, were significantly understaffed. He stated that it was his opinion, based on his experience as a previous head deputy of the SVP unit, that the unit could absorb the staffing cuts so that attorneys could be sent to the felony trial division.

97.     DPD2 testified in the underlying *Litmon/Vasquez* proceedings that there were two staffing cuts in 2014: in June and September. Over the span of the cuts, DPD2's case load jumped from 8 cases to 14.  Even after DPD2 received the redistributed cases due to the 2014 staffing cuts, and until the time DPD2 left the unit in 2017, he had absorbed three more cases.

98.     DPD1 testified in the underlying Litmon/Vasquez proceedings that in 2014, during his tenure as Deputy-In-Charge of the SVP unit, approximately fifty percent of the SVP unit's staff was cut, prompting DPD1 to notify upper management that he felt the cuts would be harmful to the SVP clients, in part because of the volume and complexity of the SVP cases.

99.     On April 8, 2014, DPD1 drafted a memorandum to the Assistant Public Defender, Division Chief, and the Head Deputy of the SVP unit regarding the decision to reduce SVP staffing. DPD1 wrote: "At this time, the SVP unit has approximately 170 cases in total. The proposal to reduce the Branch to 10 lawyers

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

would result in approximately a 100% increase in caseloads and the difficult task of reassigning roughly 85 indeterminate cases.  On average, an individual case may have five banker's boxes worth of materials. If eight to nine cases are on average reassigned, the new lawyer will have to process 40 to 50 boxes worth of material. Based on my experience in handling SVP cases, I believe the workload that is expected to be taken on by the 10 lawyers to be concerning.  The lawyer will obviously be less efficient in handling their cases but most importantly the competency of their practice may be challenged. In other words, no lawyer can be competent with such an added workload in such a short period of time."

100.   In his memorandum DPD1 went on to describe to his superiors the complexities of the SVP practice and how SVP cases differ from criminal cases:

"First, unlike a criminal case, we do not decrease our caseloads upon completing a trial (unless we win). In SVP, we have a continuing obligation to represent the client even after we lose at trial. After we lose a trial, in a year the burden shifts to the client to prove by a preponderance of the evidence that he is no longer an SVP.  Second, unlike a criminal case where one is litigating an incident(s) fixed in time, in SVP, the lawyer must stay abreast of the ever-changing nature of the law, the science of diagnosis and the science of risk assessment. In addition, since the focus of the inquiry in SVP cases is whether the individual client is currently an SVP, the lawyer must constantly reassess their cases in light of new science, age, additional treatment, release plans, etc.  Third, the lawyer must be adept in not only criminal law issues, but also be adept in SVP law, some juvenile law, some administrative law and the Code of Civil Procedure.  Finally, the SVP practice has changed dramatically since 2010. The number of scientific journal articles has increased dramatically in recent years. These journal articles cause lawyers to reassess their cases.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Recent case law affecting the practice has also caused attorneys to reassess their cases. Most importantly, when our Branch expanded to twenty lawyers, the vast majority of our cases were 2- year cases. Now the vast majority of our cases are indeterminate and obviously more likely to draw appellate review."

DPD1 concluded his memorandum with three proposals to reduce staffing more gradually.

101.   At the same time, the attorneys in the SVP unit had expressed to DPD1 feeling overwhelmed by the effects of the staffing cuts. DPD1 testified that after he drafted his April 8, 2014, memorandum to upper management, the unit held a staff meeting at which DPD1 informed the SVP attorneys of his memorandum and that it had gone unanswered by upper management of the Public Defender's Office. DPD1 recalled that the staff attorneys then conducted an impromptu meeting themselves to consider drafting a letter to the SVP management, and they instructed DPD1 and the unit's head deputy not to attend "because they wanted this letter to be from them and not us."  The letter drafted by the attorneys of the SVP unit and sent to Defendant Public Defender Ronald L. Brown on April 24, 2014, addressed the staff reduction in the unit.  The letter reiterated the same complexities of SVP law and analogized SVP law to capital litigation, stating: "The measure of our productivity cannot be judged by looking at the numbers of filings and trials. Akin to capital litigation, we win when we avoid trial." The attorneys asked that the Public Defender reconsider his decision to reduce the staff of the unit.  DPD1 did not see the April 24, 2014, attorneys' letter until after it was drafted and sent to the Public Defender, Defendant Ronald Brown.

102.   DPD2 also testified that he was one of at least 10 other deputy public defenders who drafted the April 24, 2014, letter to the Public Defender, Defendant Ronald Brown, which was hand-delivered to defendant Brown's office by a fellow deputy. That deputy received a voicemail from defendant Ronald Brown, which was

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    played on speakerphone for other deputies to hear, in which he acknowledged receipt

2    of the letter and that he was going forward with the staffing cuts, but he would

3    perhaps readdress the second round of cuts that fall.  He did not.

4        103.   Defendant Suzuki testified that it was his understanding that in 2014, the

5    unit had 20 attorneys and 120 pending cases, and that the staffing decrease to 15 or

6    10 attorneys still would allow the unit to adequately represent those 120 clients.  Mr.

7    Suzuki was present during informal discussions with other division chiefs, including

8    the SVP unit supervisor, where DPD1's concerns following the staffing cuts were

9    addressed, which resulted in another reassessment of the SVP case load.  As a result

10   of that assessment following the staffing cuts, the office concluded "that the workload

11   was reasonable."   It was not.  The SVP caseload was overwhelming the SVP unit

12   attorneys and cases such as Mr. DeCasas case continued to linger without meaningful

13   attention and with no hope of being brought trial within a reasonable time.

14       104.   DPD2 testified that in 2014, it was a well-known fact in the courthouse

15   that staffing cuts were ongoing and that "the Public Defenders were delaying their

16   cases, trying to keep up."  DPD2 was present at various conversations with Judge

17   Elaine Mandel, Judge James Bianco, and the Public Defender's Office, where the

18   office informed the court of the problems with caseloads and staffing, and that the

19   understaffing was creating great delays in the processing of the SVP cases.

20       105.   On May 2, 2014, the court asked DPD2 when Mr. DeCasas's case would

21   be ready for trial. DPD2 advised the court that Mr. DeCasas's expert was to visit Mr.

22   DeCasas in June and requested that the parties return in July. DPD2 and the Deputy

23   District Attorney agreed to a further pretrial hearing on July 23, 2014, at which Mr.

24   DeCasas was to appear via video.

25       106.   On July 23, 2014, Mr. DeCasas did not appear. DPD2 informed the court

26   that Mr. DeCasas requested he research an issue which would potentially be

27   dispositive and have implications for other clients. DPD2 stated that his "calendar has

28

64

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    been quite full." DPD2 asked for a further pretrial hearing in September so he could

2    have time to research and possibly file a motion. The court reminded DPD2 that this

3    was a 2006 case and that DPD2 needed to either file a motion or go to trial. The court

4    calendared October 6, 2014, for further pretrial hearing and motion hearing. Mr.

5    DeCasas was to appear via video.

6        107.   On August 21, 2014, DPD1 drafted a second memorandum to the

7    Division Chief and the Head Deputy assessing the impact of the first SVP staff

8    reduction.  In a section of that memorandum, DPD1 offered an example to upper

9    management where an attorney's case load increasing from nine cases to ten cases

10   disproportionately increases the attorney's workload in order to exemplify for upper

11   management that trial statistics alone were insufficient to determine whether their

12   clients were effectively being represented.  In the August 2014 memorandum, DPD1

13   wrote that the staffing cuts had placed the SVP branch in an untenable situation of

14   being ineffective and that further cuts could lead to civil liability.  He noted that he

15   feared that these cuts had purposefully implicated the SVP clients' federal

16   constitutional right to counsel.

17       108.   After the first round of staffing cuts and in anticipation of the second

18   round, the attorneys of the SVP unit wrote a letter, dated September 4, 2014, to the

19   Los Angeles County Board of Supervisors to express their concern about the

20   "improvident management decisions made by Mr. Brown and his close advisors".

21   The SVP attorneys noted that they were writing to the Board of Supervisors because

22   their concerns to Ronald Brown and the executive management had fallen on deaf

23   ears to the detriment of their clients and the County.

24       109.   On September 24, 2014, the attorneys also wrote to the State Bar of

25   California with a complaint against both the Public Defender and the Assistant Public

26   Defender for "jeopardizing the representation of [their] clients in the Public

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  Defender's Office and placing the lawyers in the untenable position of either being

2  IAC [ineffective assistance of counsel] or effectively abandoning their clients."

3       110.   After DPD1's two memoranda were forwarded to upper management in

4  April and August of 2014, staffing cuts continued in the SVP unit. DPD2 testified

5  that he felt he had no choice but to "go straight to the top" with the unit's concerns

6  with the staff cuts.

7       111.   DPD2 testified during the underlying Litmon/Vasquez proceedings that

8  he was also involved in drafting letters to the Board of Supervisors and to the State

9  Bar of California.

10       112.   DPD2 also testified that he was concerned for his position in the PD's

11  office because he had been retaliated against in the past for speaking out against the

12  staff cuts.

13       113.   At the October 6, 2014, hearing, DPD2 had not filed the motion he had

14  anticipated filing and Mr. DeCasas did not appear via video conference. The matter

15  was continued to November 24, 2014.

16       114.   On November 24, 2014, DPD2 waived Mr. DeCasas's appearance and

17  told the court he did not know when Mr. DeCasas's expert's report would be

18  completed and surmised that the delay was based on the extensive number of records

19  in Mr. DeCasas's file. DPD2 also told the court, "In addition, your honor, my

20  caseload has had a significant change since the last time we appeared in court. I'm

21  trying to make do with what I can do based on my office's lack of resources." The

22  court suggested the parties return in January and told DPD2 that the court hoped Mr.

23  DeCasas's expert's report would be completed by then since the expert had been

24  appointed nine months before. DPD2 and the Deputy District Attorney agreed to

25  continue the pretrial hearing to January 21, 2015. DPD2 waived Mr. DeCasas's

26  appearance.

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

115.    DPD2 testified in the underlying *Litmon/Vasquez* proceedings that the receipt of additional cases due to the staff cuts "absolutely did" interfere with his ability to prepare Mr. DeCasas's case for trial during the period of 2014 through the end of his tenure in the unit.  Mr. DeCasas's counsel asked DPD2, "Is it accurate to say that when you said to Judge Mandel things like 'I got to talk to my expert, I want to do a depo,' that in truth what was going on behind the scenes was that you were under water due to the staffing cuts and trying to find some reason that she might give you a continuance?" DPD2 responded, "I felt uneasy to do something in addition to the familiar refrain of I'm buckling."

116.    On January 21, 2015, DPD2 represented to the court that he could be ready for trial in late summer or early fall. The Deputy District Attorney did not object, and the attorneys agreed to continue the pretrial conference to April 17, 2015. On April 17, 2015, the Deputy District Attorney informed the court that updates would be ordered so that the Deputy District Attorney would be ready for trial. DPD2 said that he would then have Mr. DeCasas's expert review the updates and prepare a report. The court asked the parties to return in about 60 days. The parties agreed to return on June 15, 2015, and DPD2 waived Mr. DeCasas's presence.

117.    By February of 2015, Mr. DeCasas had been detained awaiting trial for 9 years.

118.    In February 2015, DPD2 attended a live question-and-answer session with Defendant Ronald Brown.  A microphone was passed around for direct questions and anonymous questions were drawn from a hat due to the atmosphere of fear, DPD2 testified.  A number of senior management members of the Public Defender's Office, including Kelly Emling, Laura Green, Michael Suzuki, Jenny Brown,   Daniel Kuperberg and Ruben Marquez were also present.  DPD2 stood up and asked Defendant Ronald Brown about how the staffing cuts were affecting his clients. DPD2 described Defendant Ronald Brown's response as defensive and

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

flippant: "He joked that our caseloads were doubled from one to two which was patently false. He disagreed with my assessment of the fiscal impact of his decision to make cuts. He described our caseloads as artificially low which also seemed to indicate that he had no idea what he was talking about. And I think he started to grow frustrated and angry because that was the last question that he answered that day."

119.   On June 15, 2015, the Deputy District Attorney had yet to order updates. DPD2 and the Deputy District Attorney again discussed the possibility of trial by the end of the year and agreed to return on August 24, 2015, for further pretrial hearing. DPD2 waived Mr. DeCasas's appearance and time. On August 24, 2015, the Deputy District Attorney apologized for not having ordered updates but believed he could have them completed in 60 days. DPD2 requested continuing the pretrial hearing to early December. The pretrial hearing was continued to December 7, 2015 and DPD2 waived Mr. DeCasas's presence.

120.   On December 7, 2015, DPD2 and the Deputy District Attorney agreed with the court's characterization that the matter only required "getting the updated reports and then setting the date for trial, basically." Anticipating that DPD2 would receive the updated reports in January and then would pass those updated reports along to Mr. DeCasas's experts, the respective counsel agreed to return on March 2, 2016. DPD2 waived Mr. DeCasas's appearance.  At the March 2, 2016, pretrial conference, DPD2 advised the court that he had received the updated evaluations and believed the parties would be able to set the matter for trial later in 2016, if DPD2 was able to depose the two evaluators. On DPD2's motion, DPD2 and the Deputy District Attorney agreed to a further pretrial conference on June 28, 2016. DPD2 waived Mr. DeCasas's appearance. DPD2 testified that he believed it was in Mr. DeCasas's best interest to waive time when updated evaluations had not been diligently ordered because, in his experience, "trial courts do play fast and loose with

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

things like laws and rules of evidence," and "more seems to come in to the detriment of the defense than is allowed by law."

121.   DPD2 described 2016 as "another busy year" for him in that, in addition to the cases he absorbed in the 2014 staffing cuts, he received three new cases and was working on an appeal of a case he finished in late 2015. On June 28, 2016, DPD2 informed the court that he was preparing to depose the State's two evaluators and waiting to receive Mr. DeCasas's expert's report. DPD2 said he "hope[d] this case would go to trial maybe by the end of [2016] or maybe early [2017], depending on how things progress." DPD2 proposed a further pretrial conference for October 2016. The Deputy District Attorney noted that the evaluations would expire in January 2017. DPD2 and the Deputy District Attorney agreed to reconvene on October 6, 2016, and DPD2 waived Mr. DeCasas's appearance.

122.   On October 6, 2016, DPD2 speculated, "I think this is a case that could and should be tried in 2017."  DPD2 proposed a further pretrial conference on January 24, 2017, and suggested that at that time, the parties should discuss ordering new updates and scheduling depositions. DPD2 continued to await the arrival of Mr. DeCasas's expert's report.  DPD2 and the Deputy District Attorney agreed to reconvene on January 24, 2017, and DPD2 waived Mr. DeCasas's appearance.

123.   In late 2016, DPD2 was assigned to another SVP case on the eve of trial because the previously assigned deputy had been transferred out of the unit. DPD2 testified that he understood that he was assigned the new case because management believed he was the only deputy who would be prepared for trial in about a month and a half.  However, upon reviewing 17-years' worth of records, DPD2 saw no way that he could be competent counsel.  DPD2 agreed with the court's assessment that "hand-offs" just do not work in the SVP line of work because extensive background preparation is required in SVP cases, such as scrutinizing any time an expert cites to an article in support of their theory, confirming experts are using articles properly,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    and looking through actuarial scores item-by item with the expert with the coding
2    rules to ensure accurate scores.

3         124.   DPD2 testified that because he was tasked by his management to review
4    a case that was at least 17 years old, thus older than Mr. DeCasas's, it took priority
5    over Mr. DeCasas's case.  DPD2 wrote an email to his head deputy about his
6    concerns of being ineffective counsel for the newly-assigned case and about the
7    possible liability to the office and the County. Also included in that email was
8    DPD2's complaint that the newly-assigned, aged case was affecting DPD2's ability to
9    assist Mr. DeCasas. Within 15 minutes of sending the email to his head deputy,
10   without a word, the head deputy entered DPD2's office and took the file off his desk
11   and walked out.

12        125.   At the January 24, 2017, pretrial conference, DPD2 advised the court
13   that he believed the matter "could possibly go to trial toward the latter part of the
14   year." He believed, at that time, the parties should discuss updating the evaluations.
15   DPD2 and the Deputy District Attorney agreed to continue the pretrial conference to
16   April 17, 2017, and DPD2 waived Mr. DeCasas's appearance.

17        126.   DPD2 testified that it was his opinion that Mr. DeCasas would never
18   participate in treatment.  DPD2 also believed, based on his familiarity with the topic,
19   his research, and testimony elicited during Mr. DeCasas's probable cause hearing,
20   that Mr. DeCasas was not a pedophile, and thus Mr. DeCasas would not benefit from
21   treatment as he was not a sexually violent predator.

22        127.   DPD2 denied that his strategy for Mr. DeCasas's case was to age the
23   case "until he was just incapacitated so that the state evaluators would find that he
24   physically was just not able to function enough to do anything."  DPD2 "had hoped to
25   have [Mr. DeCasas's] case go to trial in 2016. But cases kept popping up ... In 2014,
26   for example, [DPD2] got five or six new cases."   To the contrary, DPD2 opined that
27   delaying Mr. DeCasas's trial would be futile because Mr. DeCasas was not

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   participating in treatment and would not benefit from treatment.  Ultimately, DPD2's
2   caseload did not allow him to set Mr. DeCasas's case for trial.

3       128.   DPD2 conducted two trials during his nine-year tenure in the SVP unit.
4   Despite being Mr. DeCasas's attorney for almost a decade, Mr. DeCasas's case was
5   not one of them.

6       129.   Mr. DeCasas's third attorney from the Los Angeles County Public
7   Defender's office was assigned to Mr. DeCasas's case in April 2017.  His third
8   Deputy Public Defender (hereafter "DPD3") received a transfer memorandum from
9   DPD2.  DPD3 testified that Mr. DeCasas's file indicated that he sent a typed motion
10  to DPD2 and asked that DPD2 file the motion with the court; the above-referenced
11  immigration-related motion.  DPD2's transfer memorandum to DPD3 stated that
12  DPD2 believed the motion to be a legitimate motion, but that it needed a lot of work.
13  After about three weeks of research, DPD3 concluded that the motion was not viable
14  and did not file.

15      130.   DPD3 also testified in the underlying Litmon/Vasquez proceedings.  She
16  testified that in some circumstances, it is a feasible strategy to delay an SVP case if
17  the detainee is participating in treatment because those detainees tend to present
18  better to a jury than those who are not in treatment.  DPD3 also testified that if a
19  hypothetical SVP client had a Static-99 score of one, but two state evaluators had
20  consistently found this client to meet the SVP criteria, DPD3 would delay the case if
21  she received information that one or both of the evaluators might be replaced, in the
22  hopes that new evaluators would opine that the hypothetical client did not meet the
23  SVP criteria.  In DPD3's opinion, it was not a good strategy to age Mr. DeCasas's
24  case because his condition prevented him from participating in treatment, he had a
25  low Static-99 score, and DPD3 had been able to put together his social history and
26  release plan.

27
28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

131.    DPD3 testified that it took a couple of months to build a rapport with Mr. DeCasas.  DPD3 said that in the beginning, Mr. DeCasas did not want to speak with her.  After some time had passed, DPD3 "sometimes [ ] had a really good chat with him and then the next time [DPD3] called him, he was different."  During DPD3's representation of Mr. DeCasas, Mr. DeCasas often expressed that he was experiencing radiation and that he felt badly.  DPD3 believes that generally, Mr. DeCasas was unhappy with his public defenders and complained that the attorneys had allowed his case to drag on without doing much work.  DPD3 visited Mr. DeCasas twice at Coalinga State Hospital, but only saw him on one occasion. When DPD3 spoke to Mr. DeCasas via video, "sometimes his concentration and his ability to communicate with [DPD3] was better than others, he - sometimes he just wanted to get off the phone immediately."

132.    DPD3 testified that DPD3 discussed the work DPD3 was doing on the case with Mr. DeCasas and that he was receptive to the work DPD3 was doing to move his case forward, but he was frustrated when DPD3 would say that the case had to be continued.  Mr. DeCasas stated that he wanted to "get out."  DPD3 explained to Mr. DeCasas the SVP process and that the only way to "get out" was either having the petition dismissed or being found not to be an SVP at trial.  DPD3 testified that DPD3 explained to Mr. DeCasas that they would have to do the latter because DPD3 did not anticipate the evaluators flipping given Mr. DeCasas's lack of treatment.

133.    On April 17, 2017, DPD3 first appeared on Mr. DeCasas's behalf. There was no discussion of the matter's progress on the record. The attorneys stipulated to June 22, 2017, for further pretrial conference. DPD3 advised the court that Mr. DeCasas would be appearing via video conference.   On June 22, 2017, Mr. DeCasas appeared via video conference. The court inquired three times whether Mr. DeCasas could hear the parties, and once directed Mr. DeCasas to nod his head if he could hear the court. The record does not reflect a response from Mr. DeCasas. DPD3 stated she

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   did not know if there was a delay in the video conference feed or if Mr. DeCasas's

2   lack of response was due to his medication. DPD3 then asked for a further pretrial

3   date and DPD3 and the Deputy District Attorney agreed to September 19, 2017; Mr.

4   DeCasas was to appear via video conference.

5          134.   On September 19, 2017, Mr. DeCasas appeared via video and confirmed

6   he could hear what was occurring in the courtroom. Deputy District Attorney stated

7   that updated evaluations were needed and that those updates would take about eight

8   weeks to complete. DPD3 and the Deputy District Attorney agreed to reconvene on

9   December 5, 2017, and Mr. DeCasas was ordered to appear by video.

10         135.   On December 5, 2017, Mr. DeCasas appeared via video conference.

11  DPD3 indicated to the court that the parties were in the process of setting the case for

12  trial; however, the Deputy District Attorney needed to confer with the experts

13  regarding availability for trial. On DPD3's motion, the matter was set for further

14  pretrial conference on February 6, 2018. Mr. DeCasas was to appear via video

15  conference.

16         136.   On February 6, 2018, Mr. DeCasas did not appear via video conference.

17  DPD3 informed the court that DPD3's paralegal had spoken with Mr. DeCasas a few

18  days before. DPD3 expressed a desire to set the matter for trial, calling it "one of the

19  older cases," but indicated that DPD3 and the Deputy District Attorney would be

20  engaged in a two week-long trial beginning on April 19, 2018. DPD3 stated the belief

21  that DPD3 could be ready for trial as early as the end of May 2018.  The Deputy

22  District Attorney stated she could not be ready for trial at the end of May because she

23  had a vacation scheduled in June and another matter set for trial set in June.  The

24  Deputy District Attorney stated she had not prepared this matter for trial in May and

25  had three other trials that were already set that she was simultaneously preparing.

26  Nonetheless, the court set the matter for trial on May 1, 2018.  The Deputy District

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    Attorney strenuously objected. The court instructed the Deputy District Attorney to

2    file a written motion if she believed there was good cause to continue.

3        137.   On February 23, 2018, a notice of case reassignment was filed,

4    scheduling the next court date for March 5, 2018, in Department 56S before Judge

5    Ryan. On March 5, 2018, DPD3 asked that a further pretrial conference be set for

6    March 19, 2018, to allow time for Mr. DeCasas's expert to have his previously

7    scheduled surgery and inform DPD3 whether he would be available for trial on May

8    1. The matter was set as requested, Mr. DeCasas was ordered to appear via video

9    conference, and the May 1, 2018 trial date remained on calendar.

10       138.   During her testimony in the underlying Litmon/Vasquez proceedings,

11   DPD3 claimed that DPD3 was working to move Mr. DeCasas's case forward up until

12   the dismissal in *Vasquez*[3]. DPD3 testified that at that point, DPD3 felt that there

13   might be a conflict that would necessitate DPD3's leaving the matter and halted the

14   attempt to appoint a second expert in case a future attorney representing Mr. DeCasas

15   did not like that expert.

16       139.   On March 19, 2018, Mr. DeCasas appeared via video conference and

17   DPD3 announced, there had been a recent development in which the Public

18   Defender's Office would have to declare a conflict in all likelihood.

19       140.   Mr. DeCasas responded that he did not understand and that he expected

20   his trial to go forward in May 2018. The court explained to Mr. DeCasas that DPD3

21   might have a conflict that would prevent DPD3 from further representing him, that

22   DPD3 would definitely know shortly, and if there was a conflict, the court would

23   appoint him a new attorney. The court noted Mr. DeCasas's body language gave the

24   impression that he was not happy about the development. On the Deputy District

25   _____

26   [3] The SVP Petition in *People v. George Vasquez*, L.A. Superior Case number
     ZM004075, was dismissed on January 8, 2018.  The case proceeded to the Court of

27   Appeal of the State of California and the appellate court issued its published opinion
     in September 12, 2018. See, People v. Superior Court (Vasquez) (2018) 27 Cal. App.

28   5th 36.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Attorney's motion, the May 1 trial date was vacated, and the matter was set for April 2, 2018. DPD3 asked that the court clerk arrange to have a Bar Panel attorney present on that date. Mr. DeCasas was to attend via video conference.

141.   On April 2, 2018, one year and one month after DPD3 was assigned to Mr. DeCasas's case, DPD3 declared a conflict of interest.  The age of the case was a factor in DPD3's decision.  The court relieved DPD3 as counsel and appointed counsel from the Los Angeles County Bar Association's panel of Indigent Criminal Defense Appointments as counsel for Mr. DeCasas.  Newly appointed counsel (hereafter "Appointed Counsel") stated on the record that she and DPD3 had conferred that morning, and that she planned to obtain Mr. DeCasas's file and review the status of the case with DPD3 the next day.

142.   DPD3 informed Appointed Counsel that it appeared a motion to dismiss should be filed on Mr. DeCasas's behalf.  The court set a further pretrial conference on May 7, 2018.  On May 7, 2018, Mr. DeCasas appeared via video conference, and Appointed Counsel stated she had recently visited Mr. DeCasas at Coalinga State Hospital.  Appointed Counsel indicated that she intended to file a motion to dismiss the petition based on *Litmon* and *Vasquez* within the next 30 to 45 days and requested to be heard on the motion on July 30, 2018.  The Deputy District Attorney agreed, and Mr. DeCasas was ordered to appear via video conference. The parties appeared five more times after Appointed Counsel announced her intention to file a motion to dismiss.

143.   In sum, from the filing of the Petition in 2006 through Appointed Counsel's announcement of her intention to file a Motion to Dismiss in 2018, 52 court appearances were conducted. Mr. DeCasas appeared at 10 of those court dates. All other appearances were waived on Mr. DeCasas's behalf by DPD1, DPD2, or DPD3 except for one instance: his November 16, 2006 arraignment.  Mr. DeCasas never once personally waived his right to a speedy trial, though DPD2 did so on five

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   occasions. After the first round of staffing cuts within the SVP unit, there were 21

2   continuances.

3                                         **E.**

4        **Special allegations regarding the Board of Supervisor Defendants.**

5        144.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl

6   (hereafter "BOS Defendants") are sued herein as members of the Los Angeles County

7   Board of Supervisors and as administrators, managers and supervisors of the Los

8   Angeles County Public Defender's Office.  At all times relevant hereto, and

9   beginning on or about March 2014, these defendants individually received letters and

10  memoranda from the Craig Osaki, an attorney from the SVP Unit of the PD's Office,

11  and at least three letters from groups of attorneys from the SVP Unit which informed

12  each of these defendants of the SVP Unit's inability to competently process and

13  manage the SVP cases in the unit, including Mr. DeCasas's case.  These letters and

14  memoranda were addressed separately to each of the BOS Defendants and were

15  hand-delivered to their offices.  These memoranda and letters also informed these

16  defendants that the inability to competently manage the SVP cases was causing

17       145.   The Los Angeles County Public Defender's Office is a Department of

18  Los Angeles County.  *See, List of Los Angeles County Departments*

19  https://www.lacounty.gov/government/departments-commissions-related-

20  agencies/county-departments-and-principal-administration/.

21       146.    The Public Defender is appointed by the Los Angeles County Board of

22  Supervisors and reports directly to the Board of Supervisors.  *See*, *Los Angeles*

23  *County Charter, Article IV, Section 14.*

24       147.   The Board of Supervisors fulfills the executive, legislative and quasi-

25  judicial powers in Los Angeles County government.  In its executive capacity, the

26  supervisors are required to administer and supervise all government services,

27  including the activities of the Public Defender's Office and its administrators.  *See,*

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

*Id.*, *Responsibilities of the Board of Supervisors at*:

http://file.lacounty.gov/SDSInter/lac/1031549_BoardResponsibilities.pdf.

148.   At all times relevant hereto, the BOS Defendants were members of the Los Angeles County Board of Supervisors with direct oversight and supervisory duties over Law Offices of the Los Angeles County Public Defender.

149.   The BOS Defendants were regularly made aware of the great delays in the processing of the SVP cases, including Mr. DeCasas case.  This notification came by way of the regular meetings that they had with the administrators of the PD's Office and its SVP unit.

150.   Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez also individually met monthly, and often times more regularly, with defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl to discuss and carry out the operation and management of the PD's Office.  These meetings included discussions the PD's office's SVP Unit, its case load, individual cases handled by said unit - including Mr. DeCasas's case, the backlog of work in the SVP unit, the understaffing of that unit, and the extended time periods that SVP Unit clients were being detained as the awaited trial. Defendant Ronald Brown regularly provided defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl with memoranda, emails, reports, minutes of expanded meetings, case summaries, case management statistics and other written correspondence and documents regarding the management and operation of the SVP Unit.

151.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl oversaw, monitored and/or managed defendant The Law Offices of the Los Angeles County Public Defender.  In carrying out their oversight of said office, they had the authority to order or otherwise compel defendant The Office of the Public Defender and defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to "declare unavailability" in specific

1  SVP cases.  The PD's office often declared "unavailability" in non-SVP cases with
2  the consent of Hilda Solis.

3       152.   These regular meetings included discussions of the SVP Unit, its case
4  load, individual cases handled by said unit - including Mr. DeCasas's case, the
5  backlog of work in the unit, the understaffing of that unit, and the extended time
6  periods that SVP Unit clients were being detained.  The BOS defendants individually
7  requested and received regular memoranda, emails, reports, budget requests, and
8  other written correspondence and documents from defendants Ronald Brown, Kelly
9  Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben
10 Marquez and other members of the Public Defender's Office regarding the
11 management and operation of the SVP Unit, including the status of the civil detention
12 proceedings of Mr. DeCasas. The BOS defendants had specific knowledge regarding
13 Plaintiff's civil detention proceedings and, as spelled out herein below, was
14 deliberately indifferent to the violation of Mr. DeCasas's civil rights.   As such, the
15 BOS defendants were aware of the present plaintiff's SVP case, the long delay in
16 getting his case to trial, and the unconstitutional customs and practices which caused
17 the delays in getting Plaintiff's case to trial and the violation of his civil rights.

18      153.   The BOS Defendants also each received written letters, memoranda,
19 emails and other correspondence from the administrators of the Public Defender's
20 office and from the attorneys in the SVP Unit informing them:

21      a.   of the great delays in the processing of the SVP cases, including the
22           great delay in the processing of Mr. DeCasas's case;

23      b.   of the violation of the speeding trial rights and due process rights of the
24           SVP clients, including Mr. DeCasas;

25      c.   that Mr. DeCasas was being ineffectively represented and that, as a
26           result, the SVP attorneys were at risk of being sanctioned by the state
27           bar; and,

28

78
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

d.     that continued violation of the Mr. DeCasas's constitutional rights to counsel and due process were creating great civil liability for the County of Los Angeles and the BOS defendants.

154.    Despite actual notice of the ongoing and persistent violation of the civil rights of the SVP clients, the BOS Defendants took no meaningful steps, measures or actions during their tenure as members of the Los Angeles County Board of Supervisors to address these constitutional violations, including the ongoing violations of Mr. DeCasas's constitutional rights.

155.    Each of the BOS defendants, as a supervisor with direct authority over The Law Offices of the Los Angeles County Public Defender, had the authority to order Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to take specific actions regarding the management of Mr. DeCasas's case.

156.    Although they had the authority to do the following so as to prevent the violation of Mr. DeCasas's civil rights, BOS Defendants failed to do the following during the 13 years of Mr. DeCasas's detention:

a.     Order that the Public Defender attorneys prepare his case, request a trial, and proceed promptly to trial;

b.     Order that his case be given priority for trial over those of other SVP detainees who had been waiting for trial for significantly shorter time periods,

c.     Order that his case be transferred to appointed counsel for handling and trial;

d.     Order that a conflict be declared so as to have the case transferred to conflict counsel to proceed with Mr. DeCasas's case;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

e.    Adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys that were representing Mr. DeCasas; and,

f.    Implement internal measures in the SVP Unit to ensure that Mr. DeCasas get to trial promptly.

**F.**

**Special Allegations Regarding Notice of Constitutional Violations to Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and BOS Defendants**

157.    In early 2014, despite having a monumental backlog of SVP cases, despite the SVP unit's inability to bring many cases to trial on an annual basis, despite the SVP unit's attorneys having an insurmountable workload, and despite having the majority of their SVP cases having an average age of seven to ten years, defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez decided to cut the size of the SVP unit by 50 percent.  They knew that by doing so the delays in getting the SVP cases to trial would be exacerbated.   Once they presented their proposal to the SVP attorneys at various meetings in March and April of 2014, the SVP attorneys strongly voiced their opposition and emphasized to said defendants that their workload would become so oppressive that they would not be able to competently represent their SVP clients, that their SVP clients' constitutional rights would be violated, that they would become subject to claims of ineffective assistance of counsel and that they would be at risk of being disciplined by the state bar.

158.    The SVP attorneys wrote memoranda and letters to defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

Kuperberg, and Ruben Marquez during March, April and August of 2014 and in Auto memorialize the above concerns officially.  Said defendants read the letters and memoranda, acknowledged the concerns, but refused to take the concerns into account and went ahead with the staff reductions.

159.   Despite their fear for retaliation, the SVP attorneys wrote to their supervisors and candidly expressed their concerns and gave concrete examples of the impact that the staff reductions would have on their already overburdened ability to represent their SVP clients.  For example, the supervising attorney for the SVP unit wrote the following to these defendants in his letter of April 8, 2014:

> "At this time, the SVP unit has approximately 170 cases in total. The proposal to reduce the Branch to 10 lawyers would result in approximately a 100% increase in caseloads and the difficult task of reassigning roughly 85 indeterminate cases.  On average, an individual case may have five banker boxes work of materials.  If 8-9 cases are on average reassigned, the new lawyer will have to process 40-50 boxes worth of material.  Based on my experience in handling SVP cases, I believe the workload that is expected to be taken on by the 10 lawyers to be concerning.  The lawyer will obviously be less efficient in handling their cases but most importantly the competency of their practice may be challenged.  In other words, no lawyer can be competent with such an added workload I such a short period of time."

160.   The letter was accompanied by a proposal to reduce staffing more gradually so as to permit the SVP attorneys to competently handle the volume of cases.  The concerns and the proposal were ignored and rejected by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

161.   In a subsequent letter, the supervising attorney of the SVP unit wrote in an August 21, 2014 memorandum that staffing cuts "have placed the SVP branch in an untenable situation of being ineffective and further cuts could lead to liability," purposefully implicating the federal constitutional rights to counsel.

162.   In September of 2014 and in June of 2015, the SVP attorneys wrote similar letters and memoranda to the BOS defendants.  The letters and memoranda were sent anonymously for fear of retaliation. The letters and memoranda were hand-delivered to the respective offices of each BOS defendant.  Each of the BOS defendants read these letters and memoranda and discussed them with Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.  The concerns expressed in the letters and memoranda were acknowledged by Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez and the concerns and concrete examples of the likely results of the staff cuts were ignored and rejected by the BOS defendants without meaningful inquiry or investigation. The staff cuts were agreed to by the BOS defendants and Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez.

163.   Once the staff reductions were implemented, Defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, and Ruben Marquez met in February of 2015 with the SVP attorneys to evaluate the impact of the staff reductions.  These defendants were directly informed by the staff attorneys of the great backlog of cases, the burden of the overwhelming work related to the cases, and of the staff's inability to bring cases to trial.  They were told that the staff was essentially just continuing cases in an effort to catch up.  One staff attorney asked Ronald Brown if he had any idea how serious the impact of the staff reductions

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1   was.  Ronald Brown mocked the question and joked that the caseloads were

2   artificially low.

3        164.   As for Mr. DeCasas, after the staff cuts were implemented there were 21

4   continuances of his case between 2015 and 2018.  Neither before nor after the staff

5   cuts did Mr. DeCasas ever once waive his right to a speedy trial.

6        165.   The staff attorneys also wrote to the state bar and accused Ronald Brown

7   of  repeatedly violating rule 3-110(A) of the Rules of Professional Conduct by failing

8   to ensure that the lawyers have appropriate resources so that they would be able to

9   competently represent their clients.  This rule provided that "a member shall not

10  intentionally, recklessly, or repeatedly fail to perform legal services with

11  competence."

12  ### G.

13  **Special Allegations Regarding Concealment of Conflict of Interest**

14       166.   On April 2, 2018, one year and one month after DPD3 was assigned to

15  Mr. DeCasas's case, DPD3 declared a conflict of interest.

16       167.   By that point, however, the conflict of interest had existed for at least

17  eight years and it was deliberately concealed from Mr. DeCasas.

18       168.   The conflict of interest was created by the great delay in bringing his

19  case to trial.  Due to this great delay, Mr. DeCasas was entitled to raise the delay, and

20  resulting denial of his due process and speedy trial rights through a motion under

21  *People v. Litmon* (2004) 123 Cal. App. 4, 1156 (*Litmon I*) and *People v Litmon*,

22  (2008) 162 Cal. App. 4th 383 (*Litmon II*).  Under *Litmon*, Mr. DeCasas motion could

23  have been brought successfully by 2010 – he had been in custody then for four years.

24       169.   The PD's Office could not raise the *Litmon* issue on Mr. DeCasas's

25  behalf, however, because the lawyers and administrators from that office were the

26  cause of the delay.  As such, by 2018 when the PD's Office finally declared a conflict

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  of interest, that office had been in a factual, ethical and constitutional conflict of

2  interest for at least eight years.

3       170.   Instead, during the majority of the time that the PD's Office represented

4  Mr. DeCasas, the administrators from the PD's Office, defendants Ronald Brown,

5  Kelly Emling, Michael Suzuki, Jenny Brown, Laura Green, Daniel Kuperberg and

6  Ruben Marquez, deliberately concealed from Mr. DeCasas that he had the right to

7  raise the *Litmon* issue against them.

8       171.   As early as 2014, each one of these defendants discussed this conflict of

9  interest with Mark Ridley-Thomas, with Hilda Solis and with Sheila Khuel separately

10  and informed them that a failure to declare the conflict of interest would result in civil

11  liability.  All of these defendants agreed amongst themselves that they would not

12  raise the *Litmon* conflict of interest with the clients or with the court and that they

13  would not "declare unavailability" with the court so as to avoid being replaced as

14  attorney for Mr. DeCasas.   By doing so, they agreed that they would be able to

15  conceal the conflict of interest and avoid civil liability.   This included an agreement

16  amongst themselves that they would strenuously fight any effort to remove the PD's

17  Office as counsel for their SVP clients through *Marsden* motions.

18       172.   As agreed, for example, they fought *Marsden* motions in *People v.*

19  *Darryel Frazier* and in *People v. Corey Williams*.  In the Williams matter, even when

20  urged by the court to file a Litmon motion, counsel for Mr. Williams -

21       173.   The defendants' plan was foiled and frustrated in April of 2015 when

22  SVP clients Gaspar Zavala convinced the trial court in his cases to dismiss the PD's

23  Office as his counsel and to appoint private counsel to represent him.  New counsel

24  was appointed, and a *Litmon* motion was promptly filed which resulted in the

25  dismissal of Mr. Zavala's case under *Litmon*.  Likewise, on December 22, 2016,

26  another SVP client from the PD's Office, George Vasquez, was granted *Marsden*

27  relief.  Shortly thereafter, a Litmon motion was filed for Mr. Vasquez and his case

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1  was also dismissed.  Defendant County of Los Angeles, however, appealed the

2  dismissal of the *Vasquez* case.  The Court of Appeal of the State of California

3  affirmed the dismissal and published its landmark case, *People v. Superior Court*

4  *(Vasquez)*, (2018) 27 Cal. App. 5th 36, which found that the breakdown of the Los

5  Angeles County public defender system was the cause of the denial of Mr. Vasquez's

6  due process and speedy trial rights. *Id* at 74.[4]

7                                          **H.**

8                   **Special Allegations Regarding Damages**

9          174.   From the time he was admitted to Coalinga State Hospital in 2006, Mr.

10  DeCasas has been the subject of a court order permitting that he be medicated by

11  force.  Although classified as a "hospital", the facility is a prison, with all the

12  attendant requirements and restrictions of a prison.  Mr. DeCasas has not been, nor is

13  he free to leave, he is confined to a dorm-like cell setting, his activities are monitored

14  and restricted, and his visitation by family and counsel are restricted.

15          175.   On a daily basis, for the last 14 years, he has resisted the application by

16  force of medication that he does not want to have injected into him.  He has been, and

17  continues to be, subjected to the torture of being physically restrained by various

18  members of the custodial and medical staff and forcefully required to take medication

19  and/or receive injections, as well as to receive forced blood draws related to the

20  monitoring of his medication levels.  The process is mentally and psychologically

21  traumatic and physically painful.  As recent as October 7, 2020, Mr. DeCasas had a

22  physical altercation with the staff who attempted a blood draw.

23          176.   As alleged herein, Mr. DeCasas should not have been permitted to enter

24  into SVP proceedings through a meaningful challenge of the basis for the SVP

25  _____

26  [4] The Court in *DeCasas* echoed the *Vasquez* findings and also found that Mr.
    DeCasas's due process and speedy trial rights were violated because of the
27  breakdown of the Los Angeles County public defender system. *People v. DeCasas*,
28  2020 Cal. App. LEXIS 879, 43-44.

1    petition.  The PD's Office failed to raise legal and factual defenses at his probable

2    cause hearing which would have prevented him from being detained for the last 14

3    years and subjected to the daily torture he continues to endure.

4

5                                              **VI.**

6                              **FIRST CLAIM FOR RELIEF**

7    **DELIBERATE INDIFFERENCE CAUSING VIOLATION OF**

8    **CONSTITUTIONAL RIGHTS, AS TO DEFENDANTS RONALD**

9    **BROWN, JENNY BROWN, KELLY EMLING, LAURA GREEN,**

10   **MICHAEL SUZUKI, DANIEL KUPERBERG, RUBEN**

11   **MARQUEZ, MARK RIDLEY-THOMAS, HILDA SOLIS, SHEILA**

12   **KUEHL AND DOES 1 THROUGH 10**

13       177.   Plaintiff Rodrigo DeCasas repeats and realleges each and every

14   allegation above as though fully set forth herein.

15       178.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Mr.

16   DeCasas's rights under Sixth Amendment and Fourteenth Amendment of the U.S.

17   Constitution to a speedy trial, to counsel, and to due process and substantive due

18   process.

19       179.   Defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown,

20   Michael Suzuki, Daniel Kuperberg and Ruben Marquez, BOS Defendants and DOES

21   1 through 10 are sued herein as administrators of The Law Offices of the Los Angeles

22   County Public Defender and its SVP Unit.   Defendants Ronald Brown, Kelly

23   Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben

24   Marquez did not represent Rodrigo DeCasas as a trial attorney in any of the

25   underlying SVP commitment proceedings, and they did not appear as counsel for

26   Plaintiff in any of the underly SVP proceedings.  As such, liability against these

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    defendants is not based on these defendants acting within the scope of legal

2    representation of Mr. DeCasas.

3         180.   Plaintiff is informed and believes, and thereon alleges, that The Law

4    Offices of the Los Angeles County Public Defender, its SVP Unit, Ronald Brown,

5    Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and

6    Ruben Marquez, the BOS Defendants, and DOES 1 through 10 failed to timely bring

7    Mr. DeCasas's case to trial.  By thus abandoning the present plaintiff, said defendants

8    allowed the present plaintiff to be held as a pre-trial detainee for such inordinately

9    long period of time that his due process rights and his rights to a speedy trial were

10   violated.

11        181.   As a direct result of the deliberate indifference of the present defendants,

12   plaintiff Rodrigo DeCasas spent 13 years waiting for his case to come to trial before

13   his case was dismissed for due process violations, as alleged herein above.

14        182.   On or before Mr. DeCasas's underlying case/petition was dismissed,

15   there existed within the Public Defender's Office and its SVP Unit various customs

16   and practices which caused the delay Mr. DeCasas's case being brought to trial and

17   which caused Mr. DeCasas to unnecessarily spend years as a pre-trial detainee

18   waiting for his cases to be brought to trial.

19        183.   These massive delays in the bringing to trial of the SVP cases were the

20   result of several unconstitutional customs and practices which existed within The

21   Public Defender's Office and its SVP Unit and which the present defendants were

22   aware of and which said defendants ratified.  These customs and practices included:

23        a.    Failing to regularly bring SVP detainees to court for hearings, or to

24             otherwise ensure that SVP detainees were in court or that they would

25             appear by video conference, so as to conceal from SVP detainees their

26             delays in processing their cases in a timely manner;

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

b.   Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

c.   Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

d.   Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so;

e.   Agreeing to repeated continuances sought by the prosecution;

f.   Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

g.   Failing to meet reasonable deadlines in SVP cases;

h.   Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

i.   Allowing experts' reports to lapse or otherwise go stale;

j.   Concealing material facts from SVP clients/detainees;

k.   Concealing their misconduct from SVP clients/detainees;

l.   Failing to inform their clients of conflicts of interests;

m.   Failing to inform the court of conflicts of interest;

n.   Failing to bring cases to trial within the stipulated time period with the District Attorney's Office after the passage of Proposition 83;

e.   Failing to file oppositions to motions and other petitions by the prosecution;

f.   Allowing SVP cases to sit idle for years without meaningful progress;

g.   Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

h.   Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP detainees to file *Litmon-Vasquez* motions after the extensive delays in the processing of their cases;

i.   After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under *People v. Litmon* and *People v. Vasquez* for the violation of their constitutional rights;

j.   Refusing to declare an actual conflict upon learning of it;

k.   Failing to object to the use of hearsay evidence by the prosecution's experts;

l.   Waiving probable cause at the initiation of the SVP proceedings; and, failing to raise viable defenses to the SVP allegations, including, but not limited to whether SVP detainees are subject to deportation;

m.   Concealing conflicts of interest from SVP clients and the court, and failing to declare a conflict of interest to allow appointed/private counsel to bring motions under *People v. Litmon* and *People v. Vasquez*; and,

n.   Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

184.   Both the trial court and the Court of Appeal of the State of California have held in Mr. DeCasas's case and in the Vasquez case that there existed in the PD's Office an institutional systemic breakdown of the Public Defender system in Los Angeles County during the time that Mr. DeCasas's case was being handled by the PD's Office and that this system breakdown was the cause of the violation of his constitutional rights.

185.   As presented in detail above, the delays in bringing Mr. DeCasas case to trial resulted from the systemic breakdown in the PD's Office which resulted from:

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

a.    A flaw in the public defender's mechanism for identifying and avoiding conflicts of interest,

b.    A failure to train incoming SVP lawyers,

c.    An understaffed public defender office facing overwhelmingly heavy caseload, and,

d.    Underdeveloped expert pool and a payment system which made it difficult to promptly pay expert fees such that few experts were willing to work for the public defender's office.

186.    Defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 were aware of the inordinate and excessive delay that plaintiff and the other SVP detainees were experiencing in the processing of their cases and that Plaintiff's case and the other cases were not being brought to trial in a timely basis. Said defendants were aware of the customs and practices described above that existed at the SVP Unit and which were the causes of the failure to bring these cases to trial in a timely fashion.

187.    Between 2006 and 2019, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 learned of these delays in the processing of SVP cases and of the causes of SVP cases not coming to trial in a timely basis through their regular monitoring of the SVP Unit and the monitoring of the performance of the lawyers in that unit.  Said monitoring by defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1 through 5 consisted of:

a.    Monthly meetings with the supervisors of the SVP Unit,

b.    Annual performance evaluations of the supervisors and staff of the SVP Unit,

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

     c.    Annual review of the status of each individual SVP case, the SVP Unit case load, the SVP Unit projections for staff needs and the expert needs conducted during the preparation of the SVP Unit budget for presentation to the Los Angeles County Board of Supervisors.

     d.    Monitoring of appeals brought on behalf of SVP detainees, including the review of appellate briefs regarding and the review of the outcome of such appeals (see e.g., *Arnold v. Superior Court*, (2014) unpublished opinion involving SVP defendant who was challenging an SVP mental health examination and noting critically that "… defendant was evaluated by the hospital's department in 2007. But as of September 2013, his case had not been tried.")

188.   The BOS Defendants and DOES 6 through 10 were informed of the above-mentioned dramatic trial delays in the SVP cases, including the delays in Plaintiff's case, and of the causes of the delays in the SVP cases coming to trial in a timely basis through their regular management, supervision and administration of the Public Defender's Office and through their monthly meetings with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez.

189.   The BOS Defendants were responsible for monitoring, supervising and management of the performance of the Public Defender's Office.

190.   The BOS defendants regularly met with defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez to discuss the issues surrounding the performance of the Public Defender's Office, its SVP Unit and individual cases, including the present Plaintiff's SVP case.   As early as 2008, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez regularly discussed the significant delays in the processing of pending SVP cases with the BOS

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    Defendants.  They informed the BOS Defendants of the significant backlog of work
2    in the SVP Unit and of the great delays that were occurring in the bringing of these
3    cases to trial.   As early as 2008, they informed the BOS Defendants of Mr. DeCasas,
4    who was awaiting trial in his SVP case and informed the BOS Defendants of the
5    number of years he had been waiting for trial.

6         191.   As alleged above, attorneys from the SVP unit wrote memoranda and
7    letters to the BOS Defendants after having their concerns ignored by their
8    supervisors/administrators of the Public Defender's Office. The letters and
9    memoranda specifically noted that the clients being served by the SVP Unit were
10   suffering the violation of their speedy trial rights and their rights to counsel.
11   Moreover, these letters and memoranda warned the BOS Defendants that these delays
12   were creating civil liability for the County of Los Angeles.

13        192.   The BOS defendants received and read these letters and memoranda.
14   They met and conferred with defendants Ronald Brown, Kelly Emling, Laura Green,
15   Jenny Brown, Michael Suzuki, Daniel Kuperberg, Ruben Marquez and DOES 1
16   through 10 to discuss the contents of the letters and memoranda, but failed to take any
17   action to deal with, address, ameliorate or otherwise meaningfully respond to the
18   concerns raised by the attorneys in the SVP unit.

19        193.   Besides discussing the long delays in bringing the SVP cases to trial
20   with the BOS Defendants, Ronald Brown, Kelly Emling, Laura Green, Jenny Brown,
21   Michael Suzuki, Daniel Kuperberg and Ruben Marquez also regularly wrote emails,
22   memoranda, meeting summaries and other written documents to the BOS defendants
23   discussing the delay in the processing of Plaintiff's case.

24        194.   In the regular meetings, which were often monthly, between Ronald
25   Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel
26   Kuperberg and Ruben Marquez and DOES 1 through 10 from 2008 to 2018, these
27   defendants discussed the SVP Unit's significant backlog of cases which had not

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

reached trial in five years, ten years and, eventually, 20 years.   Annually, and often quarterly, all of these defendants collectively discussed with respect to the SVP trial delays:

    a.    Whether the delay in bringing these cases to trial violated the due process rights and speedy trial rights of the detainees, including Mr. DeCasas,

    b.    The costs of bringing each case to trial;

    c.    The reasons for the delays in bringing Mr. DeCasas's case to trial,

    d.    The delays occasioned by the lapsing of the expert reports, including in Mr. DeCasas's case,

    e.    The repeated requests for continuances by the SVP lawyers and prosecutors,

    f.    Evaluating the need in each SVP case for a declaration of "unavailability" so as to ensure that each such case was brought to trial, including making such a declaration in Mr. DeCasas's case,

    g.    Implementing internal measures in the SVP Unit to ensure that each SVP case, including Mr. DeCasas's case, got to trial in a timely fashion, and,

    h.    Requesting that the supervising judge of the criminal division assign a specific judicial officer or courtroom for the exclusive handing of SVP cases.

    195.    During every year between 2006 and 2018, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez and/or DOES 1 through 5, were aware that the customs and practices in place in the SVP unit were resulting in a large number of SVP cases, including the present plaintiff's case, not getting to trial in a timely fashion.  On a monthly basis during that time, said defendants learned of continuances of trial dates and other related dates which continued to extend the time in which the SVP cases would come

to trial.  Notwithstanding this information, said defendants failed to abolish, revoke, rescind or otherwise put a stop to these customs and practices.  They failed to:

a.    Implement internal measures in the SVP Unit to advance or otherwise expedite the bringing of the SVP cases to trial,

b.    Prioritize the oldest SVP cases to ensure they would get to trial in an expedited fashion,

c.    Institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

d.    Impose time limits for the bringing of SVP cases to trial,

e.    Establish and implement a policy, custom or practice whereby the PD's office would declare conflicts or declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or counsel from the alternate public defender's office to bring SVP cases to trial, and,

f.    Establish a policy and implement, custom or practice whereby the PD's office would declare conflicts of interest or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions.

196.    Despite knowing of the great magnitude of the delays in bringing Plaintiff's case to trial, defendants Ronald Brown, Kelly Emling, Laura Green, Jenny Brown, Michael Suzuki, Daniel Kuperberg and Ruben Marquez, the BOS Defendants and DOES 1 through 10 failed to take any reasonable measures to ensure that the constitutional rights of Mr. DeCasas were protected.  Such failure constituted deliberate indifference to the due process rights and the speedy trial rights of Mr. DeCasas.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

197.   The BOS Defendants and DOES 1 through 5 knowingly refused to terminate the acts, customs, practices and misconduct of their subordinates, which they knew was causing and would cause constitutional injury upon the SVP detainees in their charge. Said defendants failed to take reasonable measures to institute internal measures within the SVP Unit to address the long delays in getting SVP cases to trial, they failed to institute new training of their subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline their subordinates for failing to get the SVP cases to trial in a timely fashion.

198.   All of these failures on the part of defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. DeCasas.

199.   Every year between 2008 and 2018, defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 1 through 10, through the aforementioned management of the SVP Unit, were made aware of the extended delays in the SVP cases and of the resulting due process violations that the SVP detainees were suffering.

200.   Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl received separate in-person and written reports from defendants Ronald Brown, Jenny Brown, Emling, Laura Green, Suzuki, Kuperberg, Marquez and DOES 1 through 10 as to the great delays in bringing the SVP cases to trial.  Defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 were responsible for the institution of internal

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

measures within the SVP Unit to correct this unconstitutional condition but failed to do so. Such failure constituted deliberate indifference to the due process rights and the speedy trial rights of Mr. DeCasas.

201.  Defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 1 through 10 knowingly refused to terminate the customs, practices and misconduct of their subordinates, which they knew were causing and would continue to cause constitutional injury upon the SVP detainees, including Mr. DeCasas.  Said defendants had the authority to discipline supervisorial staff in the SVP Unit for failing to bring SVP cases to trial on a timely basis.  Said defendants failed to discipline their subordinates in the SVP Unit, and thereby ratified the great delays in the brining of the SVP cases to trial.

202.  Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 6 through 10 failed to institute internal measures within the PD's Office and within its SVP Unit to address the long delays in getting SVP cases to trial, they failed to order or otherwise institute new training of his subordinates in the management of SVP cases so as to ensure that SVP cases got to trial in a timely fashion, and they failed to discipline, or order the discipling of, his subordinates, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, for failing to get the SVP cases to trial in a timely fashion. These failures on the part of defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 6 through 10 constituted an acquiescence in, and ratification of, the constitutional deprivations that resulted or constituted a reckless and callous indifference to the rights of SVP detainees, including Mr. DeCasas.

203.  Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl were particularly indifferent to a tremendous degree in his disregard for the violation of the constitutional rights of the SVP detainees in general and of the violation of the

connotational rights of Mr. DeCasas specifically.  Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl forbade the Public Defender's Office and its supervisors and administrators, including defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, and Marquez, from "declaring unavailability in Mr. DeCasas's case; that is, to declare to the court that the public defender's office is "unavailable" or unable to meet its obligations and duties to Mr. DeCasas and thereby have the court assign his case to another public defender agency (such as the Office of the Alternate Public Defender) or to a private panel attorney.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl refused to allow the PD's office to "declare unavailability" in Mr. DeCasas's case and in other SVP cases despite knowing the following:

      a.      That the SVP unit was significantly backlogged in the processing of SVP cases and that the majority of the SVP cases were years delayed in getting to trial and would continue to be so backlogged;

      b.      That the SVP Unit attorneys were excessively overworked with extremely heavy caseloads that could not be processed and brought to trial in a meaningful and effective way;

      c.      That the caseload for the SVP Unit was exacerbated by a 50% reduction in staff attorneys and administrative staff such as paralegals and investigators; and,

      d.      That less than 50% of the pending SVP cases would ever get to trial within 10 years.

204.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl  knew that this exacerbated backlog of SVP cases would be efficiently and meaningfully processed to trial by having the PD's office "declare unavailability" in the older SVP cases, including Mr. DeCasas's case, so that the court could assign such cases to

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1    other agencies or panel attorneys for trial or other proceedings such as *Litmon*
2    motions.

3        205.   Defendants Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl forbade
4    the declaration of "unavailability" in SVP cases, including Mr. DeCasas's, despite
5    knowing that failing to do so would cause years of prolonged unconstitutional
6    detention of SVP detainees such as the present plaintiff.

7        206.   As a result of the above deliberate acts and omissions of defendants
8    Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark
9    Ridley-Thomas, Hilda Solis and Sheila Kuehl  and DOES 1 through 10, Plaintiff was
10   damaged and injured as alleged above by being made to endure a 13-year pre-trial
11   detention which the Los Angeles County Superior Court found to have violated Mr.
12   DeCasas's civil rights.  Plaintiff's detention continues and he has now spent more
13   than 14 years in custody.

14       207.   The conduct of defendants Ronald Brown, Jenny Brown, Emling, Green,
15   Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl
16   and DOES 1 through 10, as alleged above, was done with deliberate indifference to
17   the constitutional violations endured by the present plaintiff.  As such, punitive
18   damages should be imposed, in an amount sufficient to punish said defendants and to
19   deter future similar conduct by said defendants and others in similar positions.

20   ////
21   ////
22   ////
23   ////
24   ////
25   ////
26   ////
27   ////
28

98
**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## VII.

### SECOND CLAIM FOR RELIEF

**MUNICIPAL LIABILITY FOR VIOLATION OF CONSTITUTIONAL RIGHTS AS TO DEFENDANTS COUNTY OF LOS ANGELES AND LAW OFFICES OF THE LOS ANGELES COUNTY PUBLIC DEFENDER**

208.   PLAINTIFF repeats and realleges each and every allegation above as though fully set forth herein.

209.   This action is brought pursuant to 42 U.S.C. §1983 for violation of Plaintiff's rights under the Fourteenth Amendment.

210.   Plaintiff's due process rights were violated by the 13-year delay in bringing his case to trial as determined by the Los Angeles Superior Court and as affirmed by the Court of Appeal of the State of California as alleged above in the first claim for relief.  As a result of the aforementioned acts and omissions of defendants Ronald Brown, Jenny Brown, Emling, Green, Suzuki, Kuperberg, Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10, plaintiff's Fourteenth Amendment due process rights were violated.

211.   At the time of these constitutional violations by said defendants, defendant County of Los Angeles and defendant Public Defender's Office had in place, and had ratified customs and practices which permitted and encouraged attorneys in the Public Defender's Office to delay bringing SVP cases to trial and which violated the due process right of their SVP clients, including Mr. DeCasas.

212.   These practices, customs, policies and procedures included:

a.      Failing to regularly bring SVP detainees to court for hearings, or to otherwise ensure that SVP detainees were in court or that they would

appear by video conference, so as to conceal from SVP detainees their delays in processing their cases in a timely manner;

b.   Failing to communicate to SVP client/detainees the status of their cases, the strategies which were to be employed in defending their case, and the likelihood of success of their efforts;

c.   Failing to obtain consent from SVP client/detainees to continue hearing dates, trials dates as well as other deadlines which were in their control;

d.   Waiving of SVP client/detainees' appearance at hearings without securing their authority to do so;

e.   Continuing trial dates and other related dates without client consent and without clients waiving their rights to speedy trials,

f.   Agreeing to repeated continuances sought by the prosecution;

g.   Ignoring requests from SVP clients/detainees to bring their case to trial promptly;

h.   Failing to meet reasonable deadlines in SVP cases;

i.   Failing to timely secure experts, to ensure that such experts are properly prepared, and to ensure that such experts complete their work in a timely fashion;

j.   Failing to pay experts on a timely basis so as to avoid having experts refuse to work with the Los Angeles Office of the Public Defender;

k.   Allowing experts' reports to lapse or otherwise go stale;

l.   Concealing material facts from SVP clients/detainees;

m.   Concealing their misconduct from SVP clients/detainees;

n.   Failing to inform their clients of conflicts of interests based on their failure to bring SVP cases to trial in timely and constitutional fashion

o.   Failing to inform clients of their right to bring a motion to dismiss their case under *People v. Litmon (I and II)* and in *People v. Vasquez.*

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

p.   Failing to inform the court of conflicts of interest;

q.   Failing to bring cases to trial within the stipulated time period with the District Attorney's Office after the passage of Proposition 83;

r.   Failing to file oppositions to motions and other petitions by the prosecution;

s.   Allowing SVP cases to sit idle for years without meaningful progress;

t.   Failing to declare unavailability, such that long-delayed SVP cases could be assigned to outside/independent counsel;

u.   Tolerating a conflict of interest, in violation of state bar ethics rules and standards, and failing to declare such conflicts so as to permit their SVP detainees to file Litmon-Vasquez motions after the extensive delays in the processing of their cases;

v.   After extensive delays on their part, failing to inform SVP detainees of their right to file a motion under People v. Litmon and People v. Vasquez for the violation of their constitutional rights;

w.   Refusing to declare an actual conflict upon learning of it;

x.   Failing to object to the use of hearsay evidence by the prosecution's experts;

y.   Waiving probable cause at the initiation of the SVP proceedings; and, failing to raise viable defenses to the SVP allegations, including, but not limited to whether SVP detainees are subject to deportation; and,

z.   Failing to adhere to the State Bar guidelines for the provision of indigent legal defense services, specifically failing to monitor the caseloads of the Public Defender attorneys.

213.   The deliberate indifference to the rights of the SVP clients represented by the PD's Office was manifested in the following cases:

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

a.  The 63 cases that were the subject of the 2007 memorandum of understanding entered into by the PD's Office, the Superior Court and the District Attorney's Office.

b.  The SVP matter of People v. Gaspar Zavala;

c.  The SVP matter of People v. George Vasquez;

d.  The SVP matter of People v. Darryel Frazier;

e.  The SVP matter of People v. Jason Taylor;

f.  The SVP matter of People v. Corey Williams;

g.  The SVP matter of People v. John Lofton; and,

h.  The SVP matter of People v. Rodrigo DeCasas.

214.  Deliberate indifference to the civil rights of SVP detainees such as Mr. DeCasas was evidenced by said defendants' ignoring the long delays in the bringing of SVP cases to trial and the long pre-trial detentions suffered by SVP clients.

215.  Further deliberate indifference by these defendants was evidenced by the following acts and omissions:

a.  Failing to implement policies and procedures to advance or otherwise expedite the bringing of the SVP cases to trial,

b.  Failing to prioritize resources to the oldest SVP cases to ensure they would get to trial in an expedited fashion,

c.  Failing to discipline deputy public defenders who repeatedly failed to bring old SVP cases to trial,

d.  Failing to institute tighter controls over supervisors in the SVP Unit to ensure that they managed their subordinates in a fashion that ensured that the older SVP cases would get to trial promptly,

e.  Failing to impose time limits for the bringing of SVP cases to trial,

f.  Failing to declare conflicts or to declare "unavailability" in old SVP cases so as to ensure that the courts could appoint private counsel or

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

counsel from the alternate public defender's office to bring SVP cases to trial,

g.    Failing to declare conflicts or declare "unavailability" in those older SVP cases that were subject to a *Litmon* motion so as to permit the court to appoint private counsel to represent those detainees who had valid grounds to bring such motions, and

h.    Failing to train attorneys coming into the SVP Unit.

216.   The foregoing acts, omissions, and systemic deficiencies are and were customs, practices, policies and procedures of defendant County of Los Angeles and of defendant Public Defender's Office and by ratifying such, these defendants permitted and encouraged attorneys in the Public Defender's Office to delay in bringing SVP cases to trial in a timely fashion.  This caused, permitted and/or allowed under official sanction the attorneys of the Public Defender's Office to believe that the long delays in bringing SVP cases to trial would not be objectively, thoroughly and/or meaningfully investigated and that no negative consequences would befall them, all with the foreseeable result that said attorneys would greatly delay in bringing SVP cases to trial and thereby violate the civil rights of the SVP detainees in their charge.

217.   As a direct and proximate result of the aforementioned acts alleged herein, Mr. DeCasas has now been detained for 14 years in violation of his due process rights as alleged in the first claim for relief which caused him serious and permanent injuries and have physically, psychologically, and emotionally impaired him permanently.

218.   As a result of the above customs, practices, policies and procedures of defendant County of Los Angeles and of defendant Public Defender's Office, Mr. DeCasas was damaged and injured as alleged above by being made to endure a wrongful 14-year pre-trial detention.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

## VIII.

## PRAYER

Wherefore, plaintiff Rodrigo DeCasas demands the following relief, against all the defendants with respect each of the claims for relief above:

a. Compensatory general and special damages in an amount in accordance with proof;

b. Punitive and exemplary damages, against defendants Ronald Brown, Jenny Brown, Kelly Emling, Laura Green, Michael Suzuki, Daniel Kuperberg, Ruben Marquez, Mark Ridley-Thomas, Hilda Solis and Sheila Kuehl and DOES 1 through 10 in an amount sufficient to deter and to make an example of these defendants;

c. Reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988;

d. Costs of suit necessarily incurred herein; and,

e. Such further relief as the Court deems just or proper.

Dated: October 8, 2020              CASILLAS & ASSOCIATES

By:  /s/  Arnoldo Casillas
ARNOLDO CASILLAS
DANIEL W. GILLETTE
Attorneys for Plaintiff
RODRIGO DECASAS

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

1

**DEMAND FOR JURY TRIAL**

2        COMES NOW Plaintiff RODRIGO DECASAS and respectfully demands that

3  the present matter be set for a jury trial.

4

5

6  Dated: October 8, 2020            CASILLAS & ASSOCIATES

7

8                       By: _/s/  Arnoldo Casillas_

ARNOLDO CASILLAS

9                       DANIEL W. GILLETTE

Attorneys for Plaintiff

10                     RODRIGO DECASAS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

# EXHIBIT 1

1

2

3

<u>Memorandum of Understanding Documenting Agreed Upon Changes to the October 11,
2006 Stipulation To Implementation of "Jessica's Law" or Legislation</u>

The following memorializes the agreement reached concerning changes to the October 11, 2006 Stipulation to Implementation of "Jessica's Law" or Legislation:

1.  In direct response to the ballot initiative known as "Jessica's Law" and the related urgency legislation, on October 11, 2006, representatives from the Los Angeles County Public Defender, the Los Angeles County District Attorney and the Los Angeles Superior Court entered into a written stipulation regarding the applicable length of commitment for individuals represented by the Los Angeles County Public Defender for whom Sexually Violent Predator (SVP) petitions were pending at the effective date of the initiative or legislation. For those individuals, it was agreed that the District Attorney would seek a two year rather than an indeterminate commitment. The stipulation was signed by the Supervising Judge of the Los Angeles Superior Court Criminal Division and the Public Defender and District Attorney Head Deputies.

2.  The October 11, 2006 stipulation contained a 24 month limit by which time the pending SVP petitions would need to be tried in order to benefit from the two year commitment term provided by the stipulation. This limitation is contained in the paragraph entitled "24 Month Time Limit".

3.  Following the October 11, 2006 stipulation, the Public Defender's Office determined that it lacked the necessary resources to try all its pending SVP cases during the required 24 months provided for in order for the affected individuals to benefit from the two year commitment term. This would necessitate the Public Defender choosing which clients would go to trial before the time limit was reached and which would not, presenting ethical and liability issues. Because of this, the Public Defender sought to be relieved on 64 cases.

4.  After several months of effort, the Superior Court determined that it could not find an adequate number of private attorneys willing and qualified to assume representation of the SVP clients that the Public Defender was unable to handle. Because of this lack of available and competent private attorneys, an executive manager in the District Attorney's Office offered to withdraw the 24 month time limit in exchange for the Public Defender's maintaining representation of the 64 clients. This would ensure that these SVP clients would have competent representation and that they would not be deprived of due process because of a lack of County, attorney and judicial resources.

5.  Accordingly, in May, 2007, executive managers from the District Attorney and Public Defender agreed to rescind the section entitled "24 Month Time Limit" of the October 11, 2006 Stipulation to Implementing Jessica's Law or Legislation in exchange for the Public Defender's Office continuing representation of every one of its SVP clients. The County agreed to provide the Public Defender's Office with additional resources to enable it to handle the increased workload. Representatives of the Los Angeles Superior Court were present at the time of the agreement eliminating the 24 month time limit and were in acquiescence. All other sections of the October 11, 2006 stipulation remained the same.

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**

6. In reliance on the May, 2007 agreement to delete the 24 month time limit, the Los Angeles County Public Defender's Office maintained representation of every one of its original SVP clients.

Jane Blissert
Representative—District Attorney

Michael Suzuki
Representative–Public Defender

The Court accepts the stipulation.

Peter Espinoza
Judge, Los Angeles Superior Court

**COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL**